# UNITED STATES COURT FOR THE MIDDLE DISTRICT OF FLORIDA,

## TAMPA, FLORIDA DIVISION

UNITED STATES OF AMERICA

PLAINTIFF,

JOHN TAYLOR ex. rel.

RELATOR

    V.

CAPITAL ONE NA

CITIBANK NA

JEFFERSON CAPITAL SYSTEMS LLC

MIDLAND CREDIT MANAGEMENT INC.

DEFENDANT(S),

_____

CASE NUMBER:  8:25cv2138-JLB-NHA

DATE: 08/11/2025

SEALED

(FCA) Qui Tam COMPLAINT

FALSE CLAIM ACT 31 U.S.C. 3729-3733

JURY TRIAL DEMANDED

AUG 12 2025 AM11:21
FILED - USDC - FLMD - TPA

## TABLE OF CONTENTS

INTRODUCTION.....................................................................................…..…… 4

JURISDICTION AND VENUE……………………………..…..……….…...…… 4

PARTIES.......................................................................…..............…...…...…..… 4

OPENING STATEMENT…………………………………….......…...…........…. 12

       WHAT IS THE NEXUS OF THIS COMPLAINT……...…………......16

OVERVIEW OF CAUSE OF ACTION(S) ASSOCIATED WITH THIS
COMPLAINT …………………………………………………………......….. 20

EXHIBIT SUMMARY.....................................................…..………......…..…32

1

**STATEMENT OF RELEVANCE** ……………………………………...………......33

    **Why where the outlined firms included with this situation?** …………..………33

    **Why does this situation warrant an FCA complaint?** …………..………......35

    **What does "Perception of Compliance" mean; and how was it**

    **executed in this situation?** ……………………………………..………………..36

    **How can it be established that said conduct ("Perception of**

    **Compliance") was intentional?** …………………………………..………......37

    **What Government agency was impacted?** ……………………………..……….41

    **How does subprime lending and DEI correlate?** ………………..………........42

**How does this complaint relate to DEI and President Trumps**

**executive orders 14151 and 14173?**……………………………………………….43

**DEI funding related to Citibank NA and Capital One NA**………………...43

**How have Capital One NA and Citibank NA's ("DEI") MDI**

**funding  policy's  been used to promote and encourage**

**modern day segregation?** …………………………………………………….......45

**STATEMENT OF FACTS**…………………………………………………………… 48

    **ORIGIN STORY** ……………………………...……………………………………49

    **FACTS RELATING SPECIFICALLY TO CAPITAL ONE NA**………….......55

        **Capital One NA GLBA Violations** …………………..……………......……56

        **Capital One NA FDCPA violations** ………………..…………..……….58

        **Capital One NA FCA violations:** ……………………..……..…….…..63

        **How Capital One NA used "DEI"  initiatives to target**

        **subprime borrower's** ……………………………..…………………….65

**FACTS RELATING SPECIFICALLY TO CITINANK NA** ……….....66

**Citibank  NA GLBA Violations** …………….…………………………66

**Citibank NA FDCPA violations** …………………….………..….68

**Citibank NA FCA violations:** …………….………………..….……..70

**Citibank NA & Midland Credit Management Inc.**

**FCA violations** …………………………………………………..…71

**FACTS RELATING SPECIFICALLY TO JEFFERSON**

**CAPITAL SYSTEMS LLC** …………………………………..…..…..…74

**Jefferson Capital Systems LLC GLBA Violations** …………..……….75

**Jefferson Capital Systems LLC FDCPA violations** ………...………..77

**Jefferson Capital Systems LLC FCA violations:** ………….....………..81

**FACTS RELATING SPECIFICALLY TO MIDLAND CREDIT**

**MANAGEMENT INC.** …………………………….……………………..81

**Midland Credit Management Inc. GLBA Violations** …………..…81

**Midland Credit Management Inc. FDCPA violations** …………...84

**Midland Credit Management Inc. FCA violations:** ……………..84

**FACTS RELATING  TO CIVIL RIGHTS ACT VIOLATIONS DERIVED  FROM**

**GLBA VIOLATIONS.** ………………………………………………85

**CAUSE OF ACTION** ……………………………………………………91

**JURY TRAIL DEMANDED** …………………………………………..115

**PAYER FOR RELIEF**………………………………………..……115

## INTRODUCTION:

1. This complaint has been authorized by conduct which violated the False Claim Act 31 U.S C. 3729-3733 ("FCA"); equally this complaint has been authorized by collection practices that violated both the Fair Debt Collection Practices Act, 15 U.S.C.1692-1692p ("FDCPA"),  and the Gramm-Leach-Bliley Act 15 U.S.C. 6801-6804 ("GLBA"). Finally this action has been authorized under President Trump's Executive order 14173 "Ending Illegal Discrimination and Restoring Merit-Based Opportunity,".

## JURISDICTION AND VENUE:

2. The court has jurisdiction to grant the relief sought by the Plaintiffs pursuant to 31 U.S.C. 3729 - 3733, and 15 U.S.C. 1692k. Venue in this District is proper in that Defendant(s) directed their collection efforts into the District.

## PARTIES;

**Plaintiff: The United States of America**

3. The United States of America is the Plaintiff in this action in accordance to the False Claims Act (FCA) 31 U.S.C. 3729-3733.

**Relator: Mr. John Taylor**

4

4. Mr. John Taylor is considered a qui tam Relator in all matters related to this complaint and the topic therein in accordance to FCA 31 U.S.C. 3729-3733.

5. Mr. John Taylor also has authority for this qui tam action under President Trumpets Executive order 14173.

6. John Taylor the individual is a resident of Valrico Florida.

7. John Taylor the individual was considered a debtor under the FDCPA 15 U.S.C. 1692-1692p

8. John Taylor the individual's None Public Personal information was protected under the GLBA 15 U.S.C. 6801-6804

**Defendant: Capital One NA**

9. Capital One, N.A. (National Association) is a national bank and a subsidiary of Capital One Financial Corporation. It's a major player in the financial services industry, offering a range of products including credit cards, auto loans, banking, and savings accounts.

10. Capital One, N.A. is headquartered in McLean, Virginia, and has a significant presence across the United States, including branches in New York, Louisiana, Texas, Maryland, Virginia, New Jersey, and the District of Columbia.

11. Capital One, N.A. is one of the operating subsidiaries of Capital One Financial Corporation, which is the parent company. It is a national bank regulated by the Office of the Comptroller of the Currency (OCC).

12. Capital One, N.A. provides a wide array of financial products and services to consumers, small businesses, and commercial clients. These include credit cards, auto loans, banking services (checking, savings, etc.), and commercial banking solutions.

13. The bank has a substantial presence in several states, with branches primarily located in New York, Louisiana, Texas, Maryland, Virginia, New Jersey, and the District of Columbia.

14. Capital One, as a whole, is a Fortune 500 company, and Capital One, N.A. is a crucial part of its operations.

15. Capital One NA is considered a financial institution under the GLBA 15 U.S.C. 6801-6804.

16. Capital One NA shares consumers data with business partner and third party affiliates as Illustrated on their website (see Exhibit A);

17. Capital One NA is considered a financial institution under the GLBA and must comply with the rules outlined in said statute.

18. Capital One NA considered Exhibit A to be compliant with the consumer consent requirement of the GLBA.

19. Capital One NA shares consumers data with business partners and third party affiliates without giving consumers the option of contesting the sharing of their None Public Personal information (NPI) as outlined in the GLBA.

20. Capital One NA uses both in-house and none in-house collection representatives. When they use in-house collection representatives the rules outlined in the FDCPA do not apply (see FDCPA 1692 b(2) ); when Capital One NA uses none in-house collection representatives the rules in the FDCPA do apply (see FDCPA 1692a(6) )

21. Capital One NA mainly use none in-house collection representatives in there consumer debt collection efforts.

6

22. Capital One NA has used the FDCPA1692 b(2) exemption in multiple Jurisdiction as an excuse for not having to comply with the FDCPA; even though they mainly use none in-house collection representatives in their collection efforts.

23. Capital One NA is considered a debt collector under the FDCPA (see FDCPA 1692 a(6) )

**Defendant: Jefferson Capital Systems LLC**

24. Jefferson Capital Systems, LLC is a debt buyer who buys debt from original creditors. Jefferson Capital Systems is defined as a debt collector under the FDCPA.

25. Jefferson Capital currently touts itself to be the fourth largest debt buyer in the United States.  This debt buyer is also currently expanding into the United Kingdom and Canada.

26. Jefferson Capital specializes in purchasing and managing "non-performing," i.e., charged-off and delinquent consumer loans and debt portfolios. This debt buyer works with original creditors to buy charged-off, delinquent accounts before attempting to collect the amounts allegedly owed by consumers, which may be showing up on your credit report.

27. Jefferson Capital Systems, LLC acquires charged-off consumer accounts from various original creditors, e.g., credit card companies, banks, and other lenders.

28.  Jefferson Capital Systems buys charged-off accounts mostly in bulk at a discount and will then attempt to collect the full amount from individual consumers.

29. Jefferson Capital purchases "non-performing" debts " within a debt portfolio, and then steps into the shoes of the original creditor and manages the collection process, working to recover the full amounts allegedly owed to the original Creditor from consumers.

30. Once a charged-off debt is purchased from an original creditor by Jefferson Capital Systems, LLC, they use local court system to file a lawsuit against debtors in their attempts to collect the alleged debt

31. Jefferson Capital System's website contains an "About Us" webpage, which states:

32. Jefferson Capital is an industry-leading provider of traditional and unique recovery services for consumer charged-off accounts. Our clients include creditors and national debt buyers. We offer services such as a Payment Rewards Collections Program, purchasing and servicing of secured and unsecured bankruptcies, as well as traditional purchasing of distressed portfolios."(See http://www.jeffersoncapitalinternational.com/us/about-jefferson-capital.html.)

33. Jefferson Capital System LLC shares consumers data with business partner and third party affiliates as Illustrated on their website (see Exhibit B);

34. Jefferson Capital Systems LLC is considered a financial institution in relation to the GLBA and they must comply with the rules outlined in said statute.

35. Jefferson Capital Systems LLC considered Exhibit B to be compliant with the consumer consent requirement of the GLBA.

36. Jefferson Capital Systems LLC shares consumers data with business partners and third party affiliates without giving consumers the option of contesting the sharing of their None Public Personal information (NPI) as outlined in the GLBA.

37. Jefferson Capital Systems LLC is considered a debt collector under the FDCPA.

**Defendant: Citibank NA**

8

38. Citibank, N.A., is a National Association chartered with the Office of the Comptroller of the Currency with its principal place of business in Sioux Falls, South Dakota and conducts business throughout Florida.

39. Citibank NA engages in the business of providing retail banking services to millions of customers, including customers in Florida.

40. Citibank NA is a Division on of Citigroup, a multinational investment bank and financial services company. Wikipedia says it is one of the "Big Four" banking institutions in the United States, alongside JPMorgan Chase, Bank of America, and Wells Fargo.

41. Citibank NA is considered a national bank regulated by the Office of the Comptroller of the Currency (OCC).

42. Citibank offers a wide range of financial products and services, including credit cards, mortgages, personal loans, and commercial loans.

43. Citigroup was formed in 1998 through the merger of Citicorp (a bank holding company) and Travelers.

44. Citibank operates in numerous countries, with a significant presence in the United States and internationally.

45. Citigroup has two main divisions: Institutional Clients Group (ICG) and Personal Banking and Wealth Management (PBWM). Citibank is the retail bank within the PBWM division, offering services to individuals and small businesses.

46. Citibank provides various financial services, including: Retail Banking: Checking and savings accounts, mortgages, personal loans, and credit cards; Wealth Management: Investment advice and services for high-net-worth individuals; Commercial Banking: Loans and financial services for businesses;

Investment Banking: Services like underwriting, mergers and acquisitions for large corporations.

47. Citibank has a strong international presence, with operations in nearly 160 countries, according to Citigroup.

48. Citibank NA shares consumers data with business partner and third party affiliates as Illustrated on their website (see Exhibit C);

49. Citibank NA is considered a financial institution and must comply with the rules outlined in the GLBA 15 U.S.C. 6801-6804.

50. Citibank NA considered Exhibit C to be compliant with the consumer consent requirement of the GLBA.

51. Citibank NA shares consumers data with business partners and third party affiliates without giving consumers the option of contesting the sharing of their None Public Personal information (NPI) as outlined in the GLBA.

52. Citibank NA uses both in-house and none in-house collection representatives. When they use in-house collection representatives the rules outlined in the FDCPA do not apply (see FDCPA 1692 b(2) ); when Citibank NA uses none in-house collection representatives the rules in the FDCPA do apply (see FDCPA 1692 a(6) )

53. Citibank NA mainly use none in-house collection representatives in there consumer debt collection efforts.

54. Citibank NA has used the FDCPA1692 b(2) exemption in multiple Jurisdiction as an excuse for not having to comply with the FDCPA; even though they mainly use none in-house collection representatives in their collection efforts.

55. Citibank NA is considered a debt collector under the FDCPA (see FDCPA1692 a(6) )

10

**Defendant: Midland Credit Management Inc.**

56. Midland Credit Management is a debt purchaser of charged off debt, also known as a debt buyer. Midland files thousands of collection lawsuits across the nation each year against consumers. Midland is known for hiring local collection attorney to file the lawsuits on their behalf.

57. Midland website states that Midland Credit Management, Inc. (MCM) services accounts on behalf of Midland Funding, LLC.  MCM is located at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

58. Midland Funding, LLC is actually a subsidiary of Encore Capital Group located at 3111 Camino Del Rio North, Suite 1300, San Diego, CA 92108. Based in San Diego, California, Encore Capital Group has additional offices located in in Arizona, Minnesota, Texas, India, and Costa Rica.

59. Midland Credit Management Inc. parent company is Encore, which is one of the largest debt collectors in the United States.  Other affiliates include Midland Funding LLC, Midland Funding NCC-2 Corporation, MRC Receivables Corporation, and Midland Recovery Corp.

60. Midland Credit Management Inc. shares consumers data with business partner and third party affiliates as Illustrated on their website (see Exhibit D).

61. Midland Credit Management Inc. was required to comply with the rules of the GLBA because they were in possession of consumer None Public Personal information (NPI)

62.  Midland Credit Management Inc. considers Exhibit D to be compliant with the consumer consent requirement of the GLBA.

63. Midland Credit Management Inc. shares consumers data with business partners and third party affiliates without giving consumers the option of contesting the sharing of their None Public Personal information (NPI) as outlined in the GLBA.

64. Midland Credit Management Inc. mainly use none in-house collection representatives in there consumer debt collection efforts; they use both foreign and domestic agents.

65. Midland is considered a debt collector under the FDCPA.

**OPENING STATEMENT**:

66. "Yea, though I walk through the valley of the shadow of death, I will fear no evil: for thou art with me" (Psalm 23:4)

67. In our nation's never-ending quest for the perfect union sometime the powerless must boldly be able to "Speak truth to power"( Bayard Rustin 1955). We are a great nation, build on the principles of law and order. All individuals and or entities who are blessed to live and or do business in the greatest country in the world, must at minimum adhere to the laws, rules, and or standards established by the legislature or face repercussions. All individuals and or entities must be held accountable for their actions accordingly. There can be no gray area when it comes to the fact that, No individual or entity in our nation is above our system. Period.

68. This is a highly complex situation an a very complex complaint in general, with many variables and many moving parts. Said original complaint was investigated, researched and drafted by the Relator Mr. John Taylor, a none legal professional independently. The Relator's seek no favor nor help and fully expected this action to be held to the same stick

standard as all other similar complex FCA actions. The four firms outlined in this situation have massive amounts of resources, an are fully expected to obtain the best legal representation possible to compete in this massive situation. Nevertheless The Relator is 1000% confidence in the validly of this complaint and all material therein, and fully welcome a spirited debate on the topics outlined in this situation by any challenger accordingly. "In God we Trust ".

69. Through the course of investigation the Relator Mr. Taylor discovered that his (and millions of other consumers ) financial data was being outsourced by each of the subject firms (Capital One NA, Jefferson Capital Systems LLC, Citibank NA, and Midland Credit Management Inc.) to foreign-based representatives where U.S. privacy laws do not apply, without Proper consent, resulting in an increased risk of data breaches, and a massive risk to national security.

70. Exhibit A B C and D) where material taken from each firms website. The wording of Each firm's user sharing agreement was in contrast to the wording and intent of the GLBA 15 U.S.C. 6801-6804 (Financial Privacy Rule). At minimum from 01/01/2020 until 05/31/2025 all four firms willingly ignored the federal GLBA statute; said conduct was executed in every jurisdiction in the United States during the outlined period . The GLBA was in-acted to protect the sharing of consumers None public personal information (or NPI), and set standards for entities in possession of consumer private data. Each of the firms outlined in this complaint have not complied with the GLBA throughout the outlined period. Each firm has recklessly placed American consumer data at risk and or with foreign actors, with out seeking proper consent and or complying with

federal law. This complaint aims to hold each firm accountable for their clear oversight and or intentional misconduct.

71. Equally this complaint aim to highlight how all firms outlined in this complaint consistently committed FDCPA violations against unknowing lesser sophisticated consumers with impunity for years. All firms have been consistently ignoring FDCPA 1692g (debt validation disclosure) to add unnecessary "junk fees", reduce debtor's ability to contest the debt, and or increase profitability from their charge off account recovery sector. Two of the Creditor firms in this complaint (Capital One NA and Citibank NA) were completely ignoring all rules outlined the FDCPA, for exemptions they did not qualify for. Thus this complaint aims to highlight how all four firms, who were in the business of collecting debt, were completely ignoring federal statutes established to protect consumers during their debt collection process.

72. Finally, the overall investigation into this situation has revealed what the Relator believes to be a bombshell discovery, as it relates to "DEI" Diversity Equity and Inclusion initiatives and correlated federal funding. Any funding related to DEI initiatives would be in violation of President Trumps executive orders 14151 and 14173. "Said order prohibited the use of government funds and or disbursement correlated with DEI initiatives. Both Citibank NA and Capital One NA have had a long history with DEI initiatives since on or before, 2020 until current (2025). Said initiatives and funding thereof continue and are in direct violation of Executive orders 14173.

73. Any federal funding related to DEI initiatives would be in violation of executive order 14173. This complaint has uncovered that from as early as 2020 until July of 2025 both Citibank and Capital One have quietly encouraged and or weaponized said DEI initiative

14

to target selected minority groups within the general population. They've both consistently targeted LMI or (Low to Moderate income) community, and selected minority groups with subprime loan offerings. They've both targeted said groups without attempting to follow the GLBA or the FDCPA (when using none in-house collection representative).

74. Citibank NA and Capital One NA have intentionally promoted DEI policies as a way to level the playing field, when in really they were using said policies to maximize profit and enter pre-selected minority markets. MDI's or Minority Deposit Institutions and other DEI programs have been used to promote a new wave of segregation against none targeted racial groups of all backgrounds.. This complaint aims to highlight how two of the firm's outlined in this situation violated Executive order 14173 and several other federal civil rights statues in the name of "Diversity".

75. Profits can never outweighed accountability. All firms who operate in any business with specific federal mandates, must ensure that their firm makes all necessary efforts to maintain compliance with all federal (and or state) laws. Our system was not designed to permit certain entities to evade accountability, while simultaneously others were held accountable to the full extent of the law. This situation's no different. All firms who filed none compliant claims with the government and or committed misconduct against unknowing lesser sophisticated consumers, must be held accountable to the full extent of the law as all other rule breakers in our system.

76. This complaint aims to reinforce to all readers, that all individuals and or firms, blessed with the privilege of doing business in this great nation, must do all in their power to strictly comply with the rules established by legislature, or face severe consequences for

their carelessness and or oversight, NO EXCEPTIONS. This complaint aim to illustrate that citizens, government ,and their local law enforcement officials, can all work together for the good of our nation, and to hold rule breakers accountability accordingly. Rules are rules, they must be followed, protected and respected at all cost by all and in all settings.

77. Our current president (President Trump') set out his second term with several ambitious goals; one bring to eliminate waste fraud and abuse, and bring integrity back to our overall system. Thus this action was designed to be in lock set with presidents Trump administration's overall goals as it relates to accountability.

78. "There can be no nation without law and order" President Trump's 2020".

**WHAT IS THE NEXUS OF THIS COMPLAINT**

79. The events outlined in this complaint have fueled a host of issues to individual victims, states, and the federal government. To summarize the overall conduct outlined in this situation and some of the after effects:

80. This complaint involves four business entity defendant's, committing infractions from on or around January 1st 2020 until on or after May 31st 2025. All four firms are associated with the debt collection industry and or the collection of consumers debts. The four firms outlined in this situation include Capital One NA, Citibank NA, Jefferson Capital Systems LLC, & Midland Credit Management Inc.

81. The initial Nexus of this complaint revolves around debt collector's and or Creditor's in the business of collecting debt, ignoring federal law and reckless sharing consumers (none public personal information) NPI, without their knowledge, approval or proper consent; with unauthorized third party affiliates and or foreign agents, in their collection

efforts of consumers debts. Said actions have compromised the NPI of millions of American citizens and increase the likelihood of their NPI being involved in data breach and or used by bad foreign actors in an unfavorable manner . Said actions have directly violated the GLBA 15 U.S.C. 6801-6804, Financial Privacy Rule.

82. Equally this complaint aims to highlight how debt collector's and or Creditor's in the business of collecting debts, have intentionally ignored the FDCPA, they've knowingly ignored validating consumer debts within 5 days of initial contact (as required by FDCPA 1692g), to increase profits and or reduce the likelihood of debtors contesting the collection process. Said actions were intentionally executed by all firms during the outlined time period, on lesser sophisticated consumers, to increase each firms recovery rates of their charge off debt recovery accounts. Said actions automatically reduce the likelihood that a given debtor would contest the initial debt amount, additional fees, and or collection process, while simultaneously said actions increased the likelihood of potential profits from each account and faced the least possible risk.

83. Finally this complaint shall explore how Citibank NA and Capital One NA intentionally promoted DEI policies as a way to level the playing field, when in really they were using said policies to maximize profit and enter selective minority racial markets. MDI's and other DEI initiative have been used to promote a new wave of segregation. Pre-selected sub group and regions have been  rewarded more than other regions of the nation. This complaint aims to highlight how both firm's DEI initiatives are in violation of Executive order 14173 and several other federal civil rights statues. Citibank NA and Capital One NA knowingly executed said deceptive conduct while championing being a Corporate leader in "DEI" and or helping "People of color.

84. Each firms actions specifically impacted subprime borrowers, who mainly comprised of groups which were historically considered protected under federal civil rights statutes. Said element was uncovered in the final days of the initial investigation before the official complaint was filed. Through facts and research it was uncovered that the alleged conduct in questions has resulted in many unfavorable consequences for victims of all backgrounds, nevertheless said conduct disproportionally impacted subprime borrowers; which directly impacted several protected groups more than others.

85. The painful after effects of the conduct outlined in this complaint have been unimaginable. Said conduct has fueled the growth of more subprime borrowers, and more citizens falling into consumers debt. Entire communities comprised of "Subprime borrowers" across the nation; have not be able to bring appropriate value to their communities;  many of whom become a burden on their community because of lack of financial resources, because of their subprime status. The overall conduct outlined in this situation has directly impacted the economic volubility of communities across the nation for decades.. Subprime borrowers and other LMI community are spending massive amounts of their hard earned income on interest payment; funds which such the life out of rural and smaller communities  across the nation. Taking hard earned income from local American citizens and or communities and putting local revenue into international markets. Many regions with larger populations of subprime borrowers consistently face budget short falls because said invisible wealth transfer. Hard working populations with productive earners are being drained of their rightful revenue for other narrative.

86. The majority of subprime borrowers income goes towards paying interest and or higher rates on rent or car loans and or other needed items. Thus meaning Any conduct and or

18

practices which fueled the growth of subprime communities directly impact local community revenue growth potential, state government revenue growth potential, and the federal government's revenue growth potential.

87. . Million of our fellow brothers and sisters have fallen victim to highly advanced and coordinated corporate greed outlined in this complaint and those who executed said misconduct must be held accountable to the full extent of the law and correct their oversight immediately.

88. This complaint has outlined consistent misconduct executed on a massive scale against millions of unknowing consumers and in defiance of mulitple well established federal and state consumer protection statutes. The outlined defendant's in this complaint all used any and all means necessary to gain massive profits and national protégée, at the expense of millions of hard working unknowing lesser sophisticated consumers, and American tax payers.

89. FCA laws were enacted during the civil war to uncover fraud waste and abuse that impacted government transactions; although the statute has changed over the years; the core meaning and original intent of said statute still remains true to this day. All citizens in this nation have mandated right; said right were put in place to ensure all were receiving fair Due Process. When larger firms used their massive resources to evade required procedures; said firms are Knowingly ignoring rules established to maintain equity and promote prosperity. All firms must be aware of the fact that some inequities carry greater risk than others; moving forward firms most consider all risk when inspired by none pure motive, all must understand that some lesson are a lot more costly than others.

90. During a time when so many seek to forever stake their claim in history, this action aims to stake it's claim for justice, for the people, for the rule of law, and for our nations future.

## OVERVIEW OF CAUSE OF ACTION(S) ASSOCIATED WITH THIS COMPLAINT

91. False Claims Act 31 U.S.C 3729-3733; also known as the False Claims Act (FCA), prohibits knowingly presenting or Causing to be presented a false or fraudulent claim for payment or approval to the government, or making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim.(See 31 U.S.C. 3729-3733)

92. The FCA, specifically 31 U.S.C. § 3729, addresses fraud against the government, including situations where someone knowingly submits false claims for payment or approval, uses false records or statements to support such claims, or conspires to defraud the government. (Google2025)

93. "Knowing" Defined: The term "knowing" is defined as having actual knowledge of the information, acting in deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information. (Google 2025).

94. Qui Tam Actions: The FCA allows private citizens to file suits on behalf of the government (called "qui tam" suits) against those who have defrauded the government.

95. False Claims Act (FCA) is a key piece of legislation that governs false claims made to the government. It establishes liability for individuals and entities that submit false claims for payment or approval by the government. The FCA defines "knowing" as including not

only actual knowledge but also deliberate ignorance or reckless disregard of the truth or falsity of the information.

96. **Key elements of a false claim under the FCA:**

**False Statement or Claim:** The claim or statement submitted to the government must be false, meaning it contains inaccurate information.

**Knowledge:** The person submitting the claim must have known that the information was false. This can include actual knowledge, deliberate ignorance, or reckless disregard of the truth.

**Materiality:** The false information must be material to the claim, meaning it has a natural tendency to influence or is capable of influencing the decision of the government.

**Submission to Government:** The false claim must be submitted to the government for payment or approval.

97. In situations mulitple firm(s) were submitting none compliant claims to the IRS, which were consistently missing required mandated disclosures; thus the implied certification theory of the False Claims Act (FCA) would apply. (Google 2025)

**How the Implied Certification theory works in this context?**

98. *Implied Certification Theory applies when a company submits a claim for payment to the government (like the IRS), even without explicitly stating compliance with all relevant laws and regulations, it is considered to have implicitly certified that it has complied with these material requirements.*

*"Half-Truths" and Misleading Representations: If a firm submits claims that make specific representations about the services or information provided, but fails to disclose its noncompliance with material requirements, these representations can be seen as "misleading half-truths" under the implied certification theory. This failure to disclose can create a basis for FCA liability.*

21

*Materiality: For the implied certification theory to apply, the noncompliance with the missing disclosures must be material to the government's decision to pay the claim. This means the information withheld must be important enough that a reasonable person would attach importance to it in determining a course of action, or the defendant knows that the government would attach importance to it even if a reasonable person wouldn't. The Supreme Court in Escobar emphasized that materiality is a rigorous and demanding requirement, and it is not enough for the government to simply have the option to refuse payment. The government's consistent refusal to pay similar claims based on such omissions is strong evidence of materiality.*

*"Knowingly" standard: The firm must also be shown to have acted "knowingly". This includes having actual knowledge, deliberate ignorance, or reckless disregard for the truth or falsity of the claim.*

99. Therefore, If a firm or firms consistently failed to disclose required information to the IRS, and the missing information was material to the IRS's payment decision, then the implied certification theory of the FCA could be applied to establish liability, even without an express false statement

**President Trump 2025 Executive orders:**

100.    **President Trump Executive Order** 14151, "Ending Radical and Wasteful Government DEI Programs and Preferences," and Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity,"

101.    **DOJ May 2025 initiative:** In  May 2025, the U.S. Department of Justice (DOJ) launched a new initiative called the Civil Rights Fraud Initiative. This initiative utilizes the False Claims Act to investigate and prosecute recipients of federal funds who knowingly violate federal civil rights laws. The initiative is a coordinated effort between the Civil Division's Fraud Section and the Civil Rights Division. (Google 2025)

**Focus:** The initiative targets violations of FEDERAL CIVIL RIGHTS LAWS by recipients of federal funds, particularly those related to DEI initiatives, anti-Semitism,

22

and gender identity/sexual orientation discrimination.

**Mechanism**: The DOJ is using the False Claims Act (FCA) to pursue cases, meaning they can sue individuals or organizations for submitting false claims to the government related to civil rights violations.

**Scope**: The initiative is broad, potentially affecting various sectors and organizations that receive federal funds, including universities, healthcare providers, and government contractors.

**Key Areas of** Focus: The DOJ has identified several areas of concern, including discrimination based on RACE, gender, sexual orientation, and religious beliefs, as well as policies that may create illegal quotas or preferences.

**The Fair Debt Collection Practices Act (FDCPA)**

102.     The Fair Debt Collection Practices Act (FDCPA) 15 U.S.C. §§ 1692-1692p. the federal law that regulates debt collection practices to protect consumers from abusive, deceptive, and unfair practices. The Fair Debt Collection Practices Act (FDCPA) (15 USC 1692 et seq.) became effective in March 1978, and was designed to eliminate abusive, deceptive, and fraudulent activity amongst debt collector.

103.     Debt collectors are defined in FDCPA 1692a; The Validation notice requirements are defined in FDCPA 1692g (Validation of Debt).

*104.     Congresses stated intent for the FDCPA outlined in FDCPA 1692e, "to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent state action to protect consumers against debt collection abuses." That language indicates that Congress intended to regulate unscrupulous practices of debt collectors and level the playing*

23

*field for debt collectors who do not use abusive practices". Opinion senior Judge Moody (McKnight v. Benitez, 176 F. Supp. 2d 1301 (M.D. Fla. 2001))*

105.     FDCPA 1692f (Unfair Practices): A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

106.     FDCPA f(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

107.     Standard required for FDCPA 1692e and 1692f: see LeBlanc v. Unifund CCR Partners,601 F.3d 1185, 1193, 1201 (11th Cir 2010) (explains that the least sophisticated consumer standard would be applied to determine if there were 1692f or 1692e violations of the FDCPA)

• Least Sophisticated Consumer" Standard: Courts often use the "least sophisticated consumer" standard to determine if a representation is misleading or deceptive.

• Intent: Whether a debt collector intentionally or recklessly used false or misleading representations is a factor in determining liability.

108.     Congress has explicitly described the FDCPA as regulating "abusive practices" in debt collection. 15 U.S.C. 1692(a) – 1692(e). Any person who receives a debt collection letter containing a violation of the FDCPA is a victim of abusive practices. See 15 U.S.C. 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses").

24

109.    15 U.S.C. § 1692e generally prohibits a debt collector from using "any false,

deceptive, or misleading representation or means in connection with the collection of any

debt."

110.    15 U.S.C. § 1692e(2)(A) specifically prohibits "the false representation of

the character, amount, or legal status of any debt."

111.    15 U.S.C. § 1692e(10) specifically prohibits the "use of any false representation

or deceptive means to collect or attempt to collect any debt."

*112.    15 U.S.C. § 1692g states:*
*a) Notice of debt; contents Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—*
*(1) the amount of the debt;*
*(2) the name of the creditor to whom the debt is owed;*
*. . .*
*(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and*
*(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.*
*b) Disputed debts*
*Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.*

**The Gramm-Leach-Bliley Act (GLBA)**

113.    What is GLBA Compliance? The Gramm-Leach-Bliley Act (GLB Act or

GLBA) is also known as the Financial Modernization Act of 1999. It is a United States

federal law that requires financial institutions to explain how they share and protect their

customers' private information. To be GLBA compliant, financial institutions must communicate to their customers how they share the customers' sensitive data, inform customers of their right to opt-out if they prefer that their personal data not be shared with third parties, and apply specific protections to customers' private data in accordance with a written information security plan created by the institution.

114.    The primary data protection implications of the GLBA are outlined in its Safeguards Rule, with additional privacy and security requirements issued by the FTC's Financial Privacy Rule, created under the GLBA to drive implementation of GLBA requirements. The GLBA is enforced by the FTC, the federal banking agencies, and other federal regulatory authorities, as well as state insurance oversight agencies.

## 3 KEY RULES TO UNDERSTAND GLBA

115.    The act has three main sections, consisting of two rules and a set of provisions. The term "3 rules" seems to have been adopted to help people better understand the requirements of the legislation.

116.    Each of these three measures are designed to inform and guide organizations covered by the legislation about:

117.    The types of data to protect

118.    Specific measures expected from the bill

119.    Preventing and lessening the number of opportunities for unauthorized access

120.    Descriptions of each of those 3 components in the GLBA:

121.    **Financial Privacy Rule:** A company that is either a "financial institution" or receives "nonpublic personal information (NPI)" regarding consumers from a financial

institution must adhere to the privacy rule of the GLBA. This rule covers most personal information (name, date of birth, Social Security number, etc.) as well as transactional data (card, bank account numbers). It also covers private information you may acquire during a transaction (a credit report, for instance). The FTC has a page detailing every aspect of the privacy rule, right here.

122.     **Safeguards Rule**: This rule ensures that those under the jurisdiction of the GLBA have specific means to protect private information. According to the text of the rule itself, GLBA adherents must have "the administrative, technical, or physical safeguards you use to access, collect, distribute, process, protect, store, use, transmit, dispose of, or otherwise handle customer information." Many of these techniques are outlined in the text as well.

Notable requirements include: Employee training, Proper software, Testing and monitoring of vulnerabilities

123.     **Pretexting Provisions**: In addition to protecting nonpublic personal information (NPI), organizations that fall under the GLBA must also take measures to detect and prevent as many instances of unauthorized access as possible. There are a number of nefarious scams trying to access personal data by phone, email or even in person. Pretexting provisions aim to mitigate this data loss and protect more consumers....

**The Fair Credit Reporting Act (FCRA):**

124.     The Fair Credit Reporting Act (FCRA) 15 U.S.C. 1681:The federal law that regulates consumer credit reports, promoting accuracy, fairness, and privacy of consumer

27

information. It governs how consumer reporting agencies (CRAs) collect, use, and share credit information.

**The Fourteenth Amendment To the United States Constitution:**

125.     The Fourteenth Amendment to the U.S. Constitution, ratified in 1868, is a cornerstone of American civil rights. It defines citizenship, prohibits states from abridging the privileges or immunities of citizens, ensures due process of law, and mandates equal protection under the law.

126.     Due Process: Requires states to provide due process of law before depriving any person of life, liberty, or property. This has been a basis for incorporating many provisions of the Bill of Rights to apply against state governments.

127.     Equal Protection: Prohibits states from denying any person within their jurisdiction the equal protection of the laws

**State of Florida:**

**FCCPA F.S. 559.55 - 559.785**

128.     The FDCPA and Florida state FCCPA were designed to be similar but not identical (see Kelly v. Duggan, 282 So. 3d 969, 971 (Fla. 1st DCA 2019).  FS 559.72(3) equally required a validation notice to be sent to the debtors within 5 days of the initial collection contact (similar to 15 U.S.C 1692g). Florida Statute 559.55 outlined "unfair

debt collection practices" similar to 15 U.S.C. 1692f (which outlined collector taking advantage of the lesser sophisticated debtors).

129.    The FCCPA was intended to protect consumers and was intentionally unfair to creditors (See §559.552, Fla. Stat. (2019); Kelly v. Duggan, 282 So. 3d 969, 974 (Fla. 1st DCA 2019)), acknowledging the court's statutory obligation to construe the FCCPA in a manner that is protective of the consumer.

130.    The FCCPA is similar to the federal Fair Debt Collections Practices Act ("FDCPA").  Shaffer v. Servis One, Inc., 347 F. Supp. 3d 1039, 1044 (M.D. Fla. 2018) (providing that the FDCPA and the FCCPA are largely similar and the FCCPA is construed in accordance with the FDCPA). Section 559.77 requires that in construing the FCCPA, the court must give "due consideration and great weight" to the interpretations of the Federal Trade Commission and the federal courts interpreting the FDCPA.  §559.77(5), Fla. Stat. (2019).  Additionally, in the event of any inconsistency between any provision of the FCCPA and the FDCPA, the provision which is more protective of the consumer/debtor shall prevail.  §559.552.

131.    However, notwithstanding Section 559.552, the FDCPA and the FCCPA are not identical and a violation of the FDCPA does not automatically constitute a violation of the FCCPA.  Kelly v. Duggan, 282 So. 3d 969, 971 (Fla. 1st DCA 2019).

132.    **F.S. 559.552   Relationship of state and federal law.**—Nothing in this part shall be construed to limit or restrict the continued applicability of the federal Fair Debt Collection Practices Act to consumer collection practices in this state. This part is in addition to the requirements and regulations of the federal act. In the event of any

inconsistency between any provision of this part and any provision of the federal act, the provision which is more protective of the consumer or debtor shall prevail.

**Breach of contract (Florida)**

133.    F.S. 685.01: This statute allows parties to agree that Florida law will govern a contract if the contract is in the category described by the statute.

134.    F.S. 95.11: This statute sets the statute of limitations for breach of contract claims in Florida, which is typically within five years of the contract's formation. However, this period may vary depending on the type of contract.

**What Is Required to Prove a Case of Breach of Contract in Florida?**

135.    To succeed in a breach of contract claim, a contract breach lawyer must demonstrate:

136.    The existence of a valid contract;

137.    A material breach of the contract by the other party;

138.    Damages suffered by the non-breaching party as a result of the breach; and

139.    The plaintiff's performance of their obligations under the contract or a legal excuse for any non performance (Google 2025)

140.    **Negligence Per Se:** In tort law, if a defendant violates a statute that is designed to protect others from harm, the plaintiff does not have to prove breach of duty. The violation itself establishes negligence per se (Google 2025).

141.    A **breach of duty of care** occurs when someone fails to meet the expected standard of care owed to another person, resulting in harm or damages. This failure can

involve actions or omissions that a reasonable person would not have taken under the circumstances. (Google 2025).

**Key aspects of a breach of duty of care:**

142.     **Duty of Care**: A legal responsibility to avoid causing harm to others.

143.     **Standard of Care**: The level of care expected of a reasonable person in similar situations.

144.     **Breach**: Failing to meet the standard of care, which can involve actions or inactions.

145.     **Causation**: The breach must be a direct cause of the harm or damages suffered.

146.     **Damages**: The injuries, losses, or harm suffered as a result of the breach.

**Distinction between Breach of Duty and Negligence:**

147.     While "negligence" is often used synonymously with breach of duty, "breach of duty" refers to the failure to meet the standard of care, while "negligence" is a broader term encompassing unreasonable conduct that results in harm.

148.     In Florida, a breach of contract occurs when one party fails to perform their obligations as outlined in a legally binding agreement. This can happen in various situations, including failing to deliver goods, failing to pay rent, or not providing a promised service. To prove a breach of contract in Florida, the non-breaching party must demonstrate the existence of a valid contract, their own performance or an excuse for non-performance, the other party's failure to perform, and damages resulting from the breach.

**Key Elements of a Breach of Contract in Florida**:

149.    Valid Contract: A contract must be legally binding, meaning it includes an offer, acceptance, and consideration (something of value exchanged), as explained by The Frazer Firm.

150.    Performance by Plaintiff: The party claiming the breach must show they fulfilled their own obligations under the contract, or have a legal excuse for not doing so.

151.    Failure to Perform by Defendant: The other party must have failed to meet their contractual obligations.

152.    Damages: The non-breaching party must have suffered some harm or loss as a result of the breach.

**State of Kentucky:**

**153.    Kentucky State Rule: K.S 423.325** Personal knowledge and satisfactory evidence of identity -- Use of communication technology -- Additional information. (1) A notarial officer has personal knowledge of the identity of an individual appearing before the officer if the individual is personally known to the officer through dealings sufficient to provide reasonable certainty that the individual has the identity claimed. (This statute was highlighted for the pool transaction between Midland Credit Management Inc. and Citibank NA on 02/06/2024 Exhibit F notarized by Kentucky state notary)

**EXHIBIT SUMMARY:**

32

154.    The following are a list of the Exhibit included with this complaint:

**Exhibit A: The User Sharing Agreement from Capital One NA website.**

**Exhibit B: The User Sharing Agreement from Jefferson Capital Systems LLC's website.**

**Exhibit C: The User Sharing Agreement from Citibank NA website.**

**Exhibit D: The User Sharing Agreement from Midland Credit Management Inc. website.**

**Exhibit E: Data breach letter from Jefferson Capital Systems third party affiliate FBCS (Financial Business and Consumer Solutions Inc.)**

**Exhibit F: Material related to Citibank and Midland pool transaction from 02/02/2024**

**Exhibit G: Chart form the FDIC related to MDI's ( Minority Deposit Institutions )**

**STATEMENT OF RELEVANCE**

**Why where the outlined firms included with this situation?**

155.    Capital One NA and Citibank NA are both Creditors who are in the business of collecting debts; Jefferson Capital Systems LLC and Midland Credit Management Inc. are debt collection businesses whom also purchase consumer debts from institutional sellers. All included firms were covered under the GLBA 15 U.S.C. 6801-6804; because said statute defines each outlined firms as a financial institutions (see GLBA) , whom

33

were authorized to possess None public personal information or NPI, under specific circumstances.

156. Equally all firms outlined in this complaint were required to comply with the FDCPA, which regulates consumer debt collection practices. Jefferson Capital Systems and Midland Credit Management Inc. are considered debt collectors as defined by FDCPA 1692a, meaning they must comply with the FDCPA. Capital One NA and Citibank NA are considered original creditors, many of whom, were mainly exempt from the rules outlined in the FDCPA (see FDCPA b(2) ); but there was an exception to the original creditor exemption (see FDCPA a(6) ). Both Capital One NA and Citibank NA have ignored the fact that there manner of collection has automatically eroded their original Creditor exemption's outlined in FDCPA 1692b(2).

157. When an original creditor ONLY uses in-house collection representative, then the exemption outlined in FDCPA 1692b(2) applies; but when an original creditor uses third party affiliates and foreign agents in their collection efforts, then the original creditor and their affiliate must ALL comply with the rules outlined in the FDCPA. Capital One NA and Citibank NA both have ignored FDCPA with impunity.

158. The Relator has uncovered that since on or before January 1st, 2020 until on or around May of 2025, ALL firms outlined in this action have filed thousands (if not millions) of none compliant claims with the government and state authorities. All firms have ignored following the rules outlined in the GLBA and FDCPA in their pursuit of maximum profit. All firms have been Negligence Pre Se and breach their duty of care to millions of lesser sophisticated consumers by ignoring well established federal mandates. Several of the firms in this complaint have breach their contact with the Relator and

millions of other unknowing lesser sophisticated consumers because of said actions. All firms actions have created a clear competitive advantage for themselves over other similar debt collecting firms, who followed the rules accordingly. All firms conduct have ultimately led to numerous false claims and or false reports being filed with the government without appropriate consequences.

**Why does this situation warrant an FCA complaint?**

159.    Each of the firms outlined in this complaint were involved in the same or similar misconduct and or oversight committed during the same or highly similar timeframes, combined with additional individual infraction uncovered during the course of investigation. Overall each Firm violated the FDCPA (and multiple correlating state level consumer protection statutes) and the GLBA. Each firm seemingly breach their contact with impacted debtors because of said violations. This complaint shall review how each firm used said violations to create a clear competitive advantage for themselves over their industry peers and or other similar firms who followed the rules accordingly.

160.    This complaint shall review how each firm ignored validating consumer debt (see FDCPA 1692g) with impunity, and how said action were considered unfair to lesser sophisticated consumers (see FDCPA 1692f ); equally said conduct over the outlined time period by each firm has created a clear competitive advantage for each firm over other similar debt collecting entities (and or Creditor in the business of collecting debt) who followed the rules accordingly (see FDCPA 1692e). Each firm ranks among industry leaders in recovery of charge off collection accounts. Each firm has made massive profits because of their actions.

**What does "Perception of Compliance" mean; and how was it executed in this situation?**

161.      "Perception of compliance" is a act by corporation and or individuals to file filings in a manner which would lead most to believe a valid attempt was made to comply and or there was a simple filing error. Normally said conduct is dismissed as a simple filing error; but if any firm has a consistent record of executing the same or similar conduct, then said simple error change into a knowledge strategy. A very advance tactic but easily established if a pattern develop.

162.      Said conduct was one of the more advance action executed by each of the outlined firms in this situation. "PERCEPTION OF COMPLIANCE ". Said conduct has been willfully executed with impunity throughout the nation for years. Said action could only be notice by those who have worked in corporate environments with strict compliance authority. Most in banking and or financial services industry (should) have some experience with internal compliance teams. Compliance teams are designed to review each file filed with government authority; said team endures that each file contain all federal requirements and or required disclosure before submitted to each file to authorities. Said actions are done to promote compliance with federal and state laws and reduce a given firms liability from civil claims, fines and or penalties.

163.      All firms (should) have some sort of check in place to reduce liability before submitting files to the federal government. Any issue which was in none compliance should have been reviewed internally prior to any claim being filed with local court and or the government. Each firm clearly had other checks in place to ensure all other areas

36

were in compliance with federal and state laws. Each firm knowingly and consistently included unneeded material instead of required material.

164.    Each firm intentionally did not include required critical material in most (if not all) charge off account holder claims reviewed by Relator. Each firm choses profit over compliance; not including said materials was the more profitable than not, and faced the least liability and or enforced mechanism. Each firm willingly chose the option of gaining a completive advantage (see FDCPA 1692e), through disclosure omissions, instead of properly complying with well established Federal law.

165.    Each firm willingly choose to increasing their profitability in their charge off account sector, by not including required disclosure(s). Each firm knowingly choose the more profitable path. Then attempted to cover up their conduct by ensuring that all files filed with the courts contained material related to credit line disclosure(s). Said actions and unnecessary material thereof, were designed to mislead the least Sophisticated Consumer (see FDCPA U.S.C 1692e ).

166.    Thus said advance actions which were designed to mislead the least Sophisticated Consumer would yield the "Perception of Compliance" and or produce the false belief of filing errors, during the collection process and or at the trail court level. Said which was strategically executed by all named defendants, has went unnoticed by accountability officials for years and fueled greater misconduct throughout their industry, in pursuit of greater profits.

**How can it be established that said conduct ("Perception of Compliance") was intentional?**

167.   A clear pattern of said conduct can be seen by anyone who randomly reviewed dozens of random lower court collection case files from each firm, across multiple Jurisdiction throughout the country, through the outlined period. There's no mathematically way possible that the same simple filing error, would consistently occur over said duration, in random cases, filed in different location, at different times, and in different Jurisdiction; without said error being intentional caused by filer. The fact that multiple firms have committed the same or similar misconduct mean there little to no enforcement of said statutes. As outlined throughout this complaint, each firm knowingly used the highly advance tactic of the "Perception of Compliance" combined with other tactics, to knowingly Evade mandated federal and state disclosures requirements; actions which directly mislead lesser sophisticated consumers and were clear violations of FDCPA 1692e and 1692f.

168.   Said disclosure were material to both consumers and the government determination of funds disbursements and or allocations related to the profit or loss of the transaction. Thus when any firm's actions KNOWINGLY lead to reports, funds and or transactions filed to from or with the government, which were none compliant; said action and all related claims filed with the government would be considered none complaint False Reports and thus 31 U.S.C. 3729 violations.

**What Government agency was impacted?**

169.   Debt collectors report profits and losses through various financial statements, primarily to the IRS and sometimes to credit bureaus. When a debt collector successfully collects a debt, they report the amount as revenue, which is part of their overall

income. Conversely, if they purchase debt at a discount and collect less than the face value, the difference is reported as a loss.(Google 2025)

170. The conduct outlined in this complaint has directly impacted nearly every state in the country. Each firm consistently bring in 10's of millions of dollar monthly through various business activities. The vast majority of each firm's business activities are above board. Most of their team members operate in an ethical manner, and strive to follow the law accordingly. Nevertheless the issue outlined in this complaint were fueled by the pressure of profitability combined with the power of AI. Each firm outlined in this complaint seemingly used powerful AI tool to uncover the most profitable risk with the least likelihood of consequences; which was why all four firms misconduct correlate.

171. Said pattern was uncovered by the Relator through standard math (from a none AI human); mainly because all AI has one major flaw; its designed by humans; Meaning one of the same flaws that's plagued humanity since the dawn of time, shall away exist in human design AI; Greed. Human greed shall always present itself in human inspired artificial intelligence. This situation was no different, and derived similar results.

172. This complaint has uncovered how similar AI tools were seemingly used by all the named firms to obtain their intended results; one only need to look at the similar results achieved by each firm over the outlined time period; and equally ask one basic question; "what small action could their firm have taken to increase profitability with the least likely of consequences"?

173. The same or highly similar question was internally debated by each firm and presented to either highly advance thinker's and or AI; because all firms seemingly derived to the exact same or highly similar conclusions.

174.    Mathematically there are only a few ways to increase profitability in the subject sector without increasing production. One of the easier ways of increasing profitability from charge off recovery accounts would be to 1) restrict debtor's ability and or opportunity to contest the subject debt, add additional fees an increase the overall amount, 2)seek judgements and or settlements in local Jurisdiction, and 3) ensure that most debtors never uncovered said misconduct within the statute of limitations.

175.    Each area would increase profitability by significant amount over the course of multiple claims. By ignoring debt validation, firms have been able to add "junk" fees and other unrelated fees into debtors liability. Because the debt were not initially contested during the collection process all add fees were considered legal. Debtors have been required by the courts to pay *junk fees" associated with shady conduct.

176.    Said actions faced the least possible risk because most debtor's would only focus on individual infraction committed against their interest. Most debtors would never research the topics outlined in this complaint. Mathematically this complaint and the author has a less than .000001 change of attempting this action. Thus easily solving the match on why said conduct was executed by multiple firms over the same period. This complaint shall review the profits associated with not following the rules accordingly, vs the .000001 chance of this action and or similar actions by a victim debtor's.

177.    Each firm makes 10's if not 100's of million in revenue per month executing said illicit conduct. Now compare the fact of millions of dollars per month in revenue vs a .000001 chance of a FCA or Class action complaint related to the outlined conduct. Thus as stated each firm assessed their overall risk vs profitability mathematically using advanced thinker's and or AI. Said assessment determined that it would be more

40

profitable for any firm to ignore said rules, because the risk associated with said misconduct was minimal and the rewards were massive. (Again for all readers, no AI needed to uncover standard human Greed).

178.     If the AI systems were programmed to follow the law then we would not have this situation. If each firms compliance review team were trained to review for compliance with federal law, we would not have this situation. Nevertheless we have this situation because someone decided to be greedy and then attempted to seemingly deflect potential blame to AI systems. AI systems can only do what they're programmed to do, if a AI system was programmed to seek profit over following the law, than said system would seek to achieve the results it was designed to achieve.

**How does subprime lending and DEI correlate?**

179.     Opinion. It's my opinion that DEI policies lead to an explosion of subprime lending. Said lending and lenders specifically used DEI policies to target selected populations. Which resulted in an explosion of subprime lending, borrowing, and collection activity. Said actions have slowly drained the economic life out of the targeted regions and impacted millions of citizens, states, and the federal government for years.

**180.**     States, and local communities across the nation are losing valuable revenue to interest payments in international markets. Local communities with pockets of subprime segments find local pockets within their region frozen in time, completely devoid of economic growth; because a majority of the residents in their local communities do not have additional disposal income to support local small businesses and or investment. This

41

cycle has prevented our great nation from reaching it true economic potential. Million of American and thousands of local communities across this nation are being restricted by subprime activity; subprime activity which directly correlated with DEI policies.. Thus in accordance with president Trump's executive orders 14151 and 14173; this action aims to address  multiple firms actions which resulted from DEI policies in violation of current federal law.

**How does this complaint relate to DEI and President Trumps executive orders 14151 and 14173?**

181.    The overall investigation into this situation has revealed what the Relator believes to be a bombshell discovery, as it relates to correlating federal funding with DEI initiatives. Any funding related to DEI initiatives would be in violation of the executive order 14173. "Said order prohibited the use of government funds and or disbursement correlated with DEI initiatives. Both Citibank NA and Capital One NA have had a long history with DEI initiatives since on or before, 2020 until current (2025). Said initiatives and funding thereof have not stooped, but and are still hurting millions of American's in communities across the nation.

182.    Thus any federal funding related to DEI initiatives would be in violation of executive order 14173. This complaint has uncovered that, from as early as 2020 until July of 2025 both Citibank and Capital One have quietly continued and weaponized DEI initiative to target selected groups within the minority populations; they've consistently targeted LMI or (Low to Moderate income) community, and selected minority groups with subprime loan offerings, when better options were available. They targeted other

42

selected minority groups for MDI investments. They both targeted said minority groups without attempting to follow the GLBA or the FDCPA (when using none in-house collection representative)

**DEI funding related to Citibank NA and Capital One NA..**

183.    *Here are some of Citibank's key DEI initiatives from 2020 to early 2025 that likely had a positive impact on borrowers in these categories (according to Google 2025);*
*I. Action for Racial Equity (ARE)*
*Launched in 2020 with an initial commitment of over $1 billion, ARE aims to address the racial wealth gap in the US.*
*Key goals include:*
*Expanding banking and credit access in communities of color: This involves initiatives like supporting Minority Depository Institutions (MDIs), HomeRun mortgage program (offering low down payments and removing mortgage insurance requirements for eligible low-to-moderate income borrowers), and the Lender Paid Assistance program to help with closing costs.*
*Increasing investment in Black-owned businesses: Providing capital and support for entrepreneurs.*
*Expanding affordable housing and homeownership among Black Americans: Initiatives to support homeownership for people of color and affordable housing by minority developers.*
*Advancing anti-racist practices in the financial services industry: Citi agreed to undergo a racial audit in 2021.*

*II.  Special Purpose Credit Program: Citi has a Special Purpose Credit Program (SPCP) designed to help businesses owned by minority individuals, women, and veterans qualify for financing.*
*While aimed at small businesses, increased access to capital for these entrepreneurs could indirectly improve their financial standing and potentially their ability to access credit products.*

*III. Support for Minority Depository Institutions (MDIs): Citi provides growth capital and technical assistance to MDIs, strengthening their ability to serve racially diverse households and entrepreneurs.*
*Partnering with MDIs helps expand access to banking and credit in communities that may have historically faced barriers to accessing traditional financial services.*

*IV. Affordable Housing Resident Initiative (AHRI): Launched in collaboration with Credit Builders Alliance and community organizations, this initiative helps affordable housing residents build credit by reporting their rental payment history to credit*

*bureaus.*
*This can be particularly beneficial for individuals with thin credit files or no credit history, potentially helping them access a wider range of financial products in the future.*

*V. Community Finance Innovation Fund: This initiative supports community finance innovators, including Community Development Financial Institutions (CDFIs), who provide responsible and affordable financial products and services to individuals and small businesses in low- and moderate-income communities. CDFIs play a vital role in reaching underserved populations and offering financial products tailored to their needs.*

*184.  In 2020 Capital One Impact Initiative: A multi-year commitment launched in 2020 to promote socioeconomic mobility.*

*185.  In 2024 Capital One NA launch the Community Benefits Plan (CBP): Announced in July 2024, this five-year, $265 billion plan includes commitments such as $125 billion in credit card lending and $75 billion in automobile finance lending to Low-to-Moderate Income (LMI) consumers and those in LMI communities. The plan also aims to increase access for consumers with ITINs and maintain a significant percentage of retail locations in LMI neighborhoods.*

186.  Both firms publicly outlined goals of supporting, LMI's, MDI's, Black Americans and other historically disadvantage groups; but instead choose a more profitable path of mainly focusing on pre-selected subsets of the minority population with lesser default rates than all other groups.

187.  Both firm used said policies to target LMI or low income communities. LMI comprise mostly of Subprime borrowers. Subprime borrowers in America come from all backgrounds but are disproportionately represented in two groups Black Americans and Hispanic Americans.

188.  Both firm are industry leading lenders for subprime borrowers.

44

189.    Both firms have willingly ignored the GLBA since on or before January of 2020, and shared their consumer data with numerous business partners, third party affiliates and other foreign agents. Then if any borrowers were to default, both firms have consistently used none in-house collection representatives in their collection efforts, and boyh firms have outright ignored the FDCPA with impunity. Then both firm used said loophole to increase fees and confuse lower courts with (FDCPA 1692b(2) ) exemption claims.

190.    Thus as outlined in this section both firms DEI policies have contributed to the events outlined in this situation and beyond. Both firms must be held accountable for their intentional misconduct

191.    Our nations legendary civil rights leader Martin Luther King Jr. would be rolling in his grave, if he seen how DEI policies and other so called "People of Color" initiatives, have been weaponized against large segments of the population, to promote a new wave of segregation, against all other Americans with impunity and funded by our Government, in the name of diversity.

**How have Capital One NA and Citibank NA's ("DEI") MDI funding policy's been used to promote and encourage modern day segregation?**

192.    *Research from the FDIC suggests that Asian American Minority Depository Institutions (MDIs) tend to serve and lend primarily within their own racial and ethnic group. Studies on the lending practices of minority-owned banks generally indicate that:*

193.    *Same-race lending is prevalent: Minority-owned banks, including Asian MDIs, often focus their lending towards borrowers of the same race or ethnicity as the bank*

*owners, according to the Federal Reserve Board. This can be observed with over 70% of mortgages originating with borrowers of the same race as the bank owners.*

194.    *Targeted Outreach and Service Areas: MDIs, including those serving Asian American communities, are known to tailor their outreach and services to the specific needs and demographics of the communities they are designated to serve. This often results in higher concentrations of borrowers from the same minority group within their loan portfolios. (according to the FDIC).*

195.    Thus not only are black Americans citizens being excluded from a major of DIE MDI funding, but White American citizens and other minority groups are being seemingly discriminated against a well; all in the name of supporting "Diversity" and or "people of color"; and Banks like Citibank NA and Capital One NA and other major institutions have funded and fuel this madness through their DEI initiatives.

196.    (See Exhibit G) Of 1793 MDI branch locations in the United States in 2019, Black Americans accounted for 152, with over 90% of the black owned MDI's located outside the southern United States. The vast majority of MDI's only lead to their Targeted racial group (according to the FDIC). Thus by the numbers Black Americans especially those in the Southern regions have been disproportionately eliminated form MDI DEI funding, which had been promoted to mainly encourage and or support black own businesses. Hispanic Americans equally are disproportionately impacted from their group association; which some sub groups receiving the same specialized funding opportunities over others. Single white man have equally been disproportionally impacted by the outlined policies. All white Americans do not come from privileged back grounds, many lower income individuals within said racial group face the same of similar challenges as most monitory groups. Nevertheless because of the outlined DEI policies, single straight

46

white men of none privileges background have no special access to any advancement. They are excluded from all MDI programs and there background prevents them from gaining access to mainstream funding sources. Thus fueling the seemingly permanent under class of white citizen populations across the nation which mainly derived from single white man without proper funding and or support (combined with our nation's drug problem which equally contributes to this situation as well).

197.    Married white man both straight and or none straight have access to some forms of MDI funding through their spouse. But none married single white man of none privileged background in America are the one group most impacted by DEI policies (by the numbers); followed very closely by Black Americans (The publicized face of said DEI policies), and sub Hispanic groups. These are the results by the numbers, without political motivation or personal agenda. And this complaint has exposed a fact that most Americans had no idea of. Thus this complaint also highlighted how both Capital One NA and Citibank NA both played a major role in advancing said madness.

198.    For decades Black Americans and many other communities in regions across the nation have wonder how so many other American minority groups could come into their local small communities from regions far away, and open up businesses with what seemed like unlimited investments, at a much higher rate than individuals from their local regions. Black American communities and many other LMI communities across the nation have witnessed other minority groups, from other backgrounds, and from regions across the world, come into their local communities and open up businesses in prime location; businesses which had been largely funded by American MDI's under the rouse of DEI. Then many citizens have wittiness most of said new businesses and or business

owner, only hire from their selected group, and many seem to send a portion of the money they earned locally away from the local community where the actual business resided in, while other portions of their income from local American communities, goes back to the MDI (and their Corporate supporters) who funded the business, and or international markets.

199.    Most local community only benefit from the product and or service of the subject new MDI supported business, while simultaneously their communities resources are slowly drained away to support shareholders in international markets and or remittance payments to other regions. As stated from the opening of this complaint, said conduct has slowly drained the economic life out of communities across the nation both large and small for years; all under the name of Diversity, Equity, and Inclusion. Productive working citizens locally earned income has been slowly siphon away to fuel other outlandish narratives. Thus said conduct must be confronted and this complaint aims to do just that.

**STATEMENT OF FACTS**

**Section overview:**

200.    This section shall review each firm specific infraction and the timelines thereof. The who, what, where, when, and why. To ensure each firm can properly respond appropriately to each claim associated with their firm's misconduct, each subsection in this section shall focus on the timelines and or issues related to each firms actions

separately; all events outlined in this complaint occurred during the above outlined time period.

201.    There will be some common timelines and infraction related to each firm. Capital One NA sold one of the Relator debt to Jefferson Capital Systems, and Citibank NA sold one of the Relator wife debt, (witness Tunya Taylor ) to Midland Credit Management Inc. Jefferson Capital System LLC had a data breach of the information sold to them by Capital One NA; Citibank NA and Midland Credit Management Inc. had a questionable pool transaction which occurred during the same time period. All of said events and more shall be reviewed accordingly in this section.

**ORIGIN STORY:**

202.    The investigation into this FCA complaint begin in mid February 2025; at the time the Relator Mr. John Taylor was involved in 4 separate actions in Florida Courts. 3 of the actions (with firms, Capital One NA, Jefferson Capital Systems LLC, Citibank NA), said actions against Mr. Taylor, were all related to consumer debts; the 4th complaint related to Mr. Taylor's wife Tunya Taylor and her consumer debt from Citibank NA purchased by Midland Credit Management Inc.

203.    On or around mid February 2025, During the course of proceedings for one of the cases, Mr. Taylor first uncovered that Midland Credit Management Inc. did not send his wife Tunya Taylor her validation letter as required by FDCPA 1692g. Mr. Taylor also uncovered additional errors related to the referenced pool transactions between Citibank NA and Midland Credit Management Inc. associated with said debt (said topic shall be reviewed further in future sections of this complaint). Mr. Taylor research tons of

available public data on Midland Credit Management Inc. and uncovered that they had been consistently ignoring debt validation element of the FDCPA, in multiple reviewed files from multiple jurisdiction.

204.    Upon finding so many consistent errors with Midland Credit Management Inc.; the Relator Mr. Taylor decided to review each of the other firms, whom he was involved in litigation with. Mr. Taylor uncovered that all of the four firms outlined in this complaint were intentionally Ignoring the FDCPA 1692g with impunity, and other rules outlined in the FDCPA.

205.    Said conduct clearly gave each firm a competitive advantage over other similar debt collecting entities who followed the rules outlined in the FDCPA accordingly; and were considered specific violations of the FDCPA (see FDCPA 1692e and 1692f).

206.    Additional Mr. Taylor was a victim of a data breach from Defendant Jefferson Capital Systems LLC; said breach was related to a debt sold to Jefferson Capital Systems LLC from Capital One NA. Jefferson Capital Systems shared Mr. Taylor's information with third party affiliates FBCS. FBCS had a data breach (more on this topic in future sections) (See Exhibit E). FBCS was not authorized to possess Mr. Taylor's NPI(none public personal information) without Jefferson Capital Systems LLC first following the rules outlined in the GLBA 15 U.S.C. 6801-6804 (Financial Privacy Rule). Jefferson Capital Systems LLC not only did not follow the GLBA in Mr. Taylor's situation, but their website section 10 Exhibit B was also not inline with the wording of the GLBA. Thus Mr. Taylor uncovered that Jefferson Capital Systems was equally in violation of the GLBA.

207.    Upon researching the other firms, Mr. Taylor equally uncovered their user sharing agreement were equally not in compliance with the GLBA. Each of the four firms users sharing agreement (Exhibit A B C and D ) highlight how they share consumer data with third party affiliates and or business partners; each firm highlight how they use (None in-house) third party affiliates and or foreign agents in their collection efforts. Thus it was uncovered that each firm had been ignoring multiple mandated requirements and in some cases, Consumer data was being compromised because of said conduct.

208.    During small claims proceeding for Defendant's Capital One NA, they stated that the rules outlined in the FDCPA did not apply to them because they were an original Creditor and exempt from the FDCPA  (see FDCPA 1692b(2)); Capital One NA and many other original creditors have used said original creditor exemption (loophole )to avoid accountability for intentional misconduct for years. Capital One NA  admitted to using third party affiliates and or foreign agents during their collection attempts of the Relator's debt, during the small claim proceeding.. Upon further review the Relator Mr. Taylor uncovered FDCPA 1692a(6), which removed the original creditor exemption of FDCPA 1692b(2); if an original creditor used none in-house third party to collect on the subject debt., then they must comply with the rules outlined in the FDCPA.

209.    Thus said fact highlight how in this situation both Capital One NA, and Citibank NA (who both mainly uses none in-house collection representatives, to assist in the collection and recovery efforts of their charge off accounts); have been required to comply with the rules outlined in the FDCPA, but both were not complying.

210.    The combination of said conduct constitute multiple false claim act FCA 3729-3733 violations. Said conduct uncovered during the course of investigation,  clearly

51

highlight millions of possible false and or none compliant claims reported to and or filed with the federal government.

211.    On 04/28/2025 Mr. Taylor officially informed all firms included in this complaint of some of the newly uncovered additional infractions, most notably each firms (initial) FCA violations. Mr. Taylor gave each firm until 05/02/2025 to seek to resolve said situation internally and in a bilateral manner. No resolution were agreed too, so on 05/02/2025 Mr. Taylor formally reported all known misconduct to the government and multiple States associated with said misconduct.

212.    After 05/02/2025 Mr. Taylor officially became a Relator in all matters related to this case and the conduct reported to the government, and or uncovered during the course of investigation. One of the government agencies contacted was the FTC's and CFPB. The FTC was the lead agency to report said conduct too; Mr. Taylor reported all conduct known at the time to authorities. On 05/31/2025 the state of Florida equally sent the CFPB information provided from Mr. Taylor related to the referenced infractions. Other state and federal agency's were contacted as well.

213.    On or around 07/26/2025. After looking at all the facts and evidence outlined thus far. The Relator contemplated one central question. Where subprime borrower's targeted by the two creditor firm; and if so how? Said initial question lead down what could only be described as a strange rabbit hole. After only a short amount of research the Relator was able to detect to a strange association between LMI ( low to Moderate income) communities and subprime borrowers. He then uncovered that LMI's and subprime borrower's comprise of citizens from all backgrounds, but most subprime borrower's in LMI's come from two racial groups which were historically consider protected under the

1964 civil rights act (Black Americans, and Hispanics Americans). Subprime lending is very risky but profitable business.

214. To be clear to all readers, the Relator personally love all Americans and all peoples of the world. He has life long friends and family from all backgrounds. He hold no animosity towards any racial group period. Nevertheless as a qui tam Relator, investigating a major matter, one must be able to call a spade a spade. Thus this complaint aims to derived all conclusion related to this topic based on facts, evidence, and numbers.

215. The topics outlined in this section have been hot button issues. The term "DEI' generates all kinds of emotion, from all sides, nevertheless our investigation into this situation has uncovered a troubling connection between DEI initiatives, LMI communities, and targeting of subprime borrowers, and MDI's and the specific favoritism and or targeting of other specfic per-selected minority groups in relation to MDI's, both in Direct violation 1964 civil rights act violations. And equally both were in direct violation of presidents Trump's Executive order 14173.

216. While drafting this complaint the Relator uncovered Two of the Firms outlined in this complaint were in violation of Executive order 14173 and 14151, related to President Trump's DEI policies.

217. The Relator discovered the fact that both Capital One NA and Citibank NA were 2 of the top subprime lenders in the nation. Then he discovered the fact that Subprime borrowers mainly comprised of groups which were historically considered protected; along with other citizens. Then he discovered that both firms target LMI's and MDI's and have widely used both phrase when referencing DEI initiatives.

218.     Most LMI community in America comprise of subprime borrowers. Thus both firms seemingly specifically targeted LMI regions known to contain large amounts of subprime borrowers, with subprime loan offerings. Both firm targeted said populations while simultaneously ignoring the GLBA and FDCPA (in none in-house collection efforts). Both firms used DEI policies to fuel their Subprime lending ambitions among some populations (most notably Black Americans, Hispanic Americans, lower income white Americans who live in LMI's).

219.     Conversely both firms used MDI's to achieve a different objective. This complaint has uncover that both firms used MDI's to target pre-selected minority population with low default rates, historically lower than all other racial subgroups.

220.     Most MDI in America are owned by Asian American (see Exhibit F). Asian American community have the least default rates amongst all racial groups in America. According to the FDIC most MDI's are in metropolitan regions. Major cities like Los Angeles, New York, Miami, and related regions comprised the vase majority of all MDI's branch locations and lending thereof.

221.     Capital One NA and Citibank NA both used DEI initiatives to gain more subprime borrower's, thus they promoted helping LIM's to achieve this objective; they both firms sought to balance out their risky subprime objective by increasing their relationship with pre-selected racial groups with lower default rates.

222.     Both Capital One NA and Citibank NA actively encourage and sought subprime borrowing through LMI. Capital One NA, Citibank and many others decided the best way to target subprime borrowers was through DEI initiatives. Both Capital One NA and Citibank used DEI policies to increase their market share of subprime borrower's in

LMI's and other communities across the nation. But that was only half of the story; Capital One NA and Citibank equally both have been using DEI, (MDI's ) Minority Deposit Institution, to gain more "high value" consumers from pre-selected minority groups (i.e. Some Asian American communities, some Hispanic American communities, and some Native American communities). Capital One NA and Citibank were promoting MDI's as part of their DEI initiatives, but were using MDI's to gain market share from pre-selected communities.

223.    Although MDI's have played a critical role in our nation's history, many modern day MDI's are none compliant with several federal civil rights statute. and said DEI initiatives seemingly directly violated several other federal civil rights statutes, and two of President Trump's most recent executive order (Executive order 14173 and 14151).

**FACTS RELATING SPECIFICALLY TO CAPITAL ONE NA:**

224.    Capital One NA violated the FCA because of the conduct outlined in this section.

225.    From 01/01/2020 until 05/31/2025 Capital One NA knowingly engaged in misconduct to evade known federal and state statute. Capital One NA internationally ignored the rules outlined in FDCPA and sister state level consumer protection laws, as well as the GLBA, which cause numerous false reports and or false claims to be filed and was the core reason for this FCA complaint.

226.    Capital One NA a highly profitable entity has been using advanced tactic and or AI to intentional mislead lesser Sophisticated consumers and evade federal and state consumers protection statutes; at the expense of unknowing lesser sophisticated

55

consumers; and in a manner which correlated profit and or loss with government transactions.

227.    Capital One NA is one of the largest Creditor's in the nation. They have millions of accounts and have operations in nearly every major market in the world. Capital One has millions of charge off account claims yearly. Some they directly challenge in court, others they sell to collection agency and or debt buyers.

228.    Capital One NA has been involved in the financial services industry for decades, they fully know all federal and state statute in and out.

**Capital One NA GLBA Violations:**

229.    From on or before 01/01/2020 until 05/31/2025 Capital One NA committed millions of GLBA violation.

230.    Capital One NA website highlights their user sharing agreement (see Exhibit##). Said agreement was considered by Capital One NA as consumer notification of the sharing of NPI with business partners, third party affiliates, and or foreign agents.

231.    Capital One NA's conduct and pattern of intentionally not including required disclosures was initially uncovered by the Relator during the research for his small claims proceeding related to one of his Capital One NA accounts in February of 2025. The Relator Mr. Taylor had 2 Capital One NA related cases in county court. One case was Capital One NA suing Mr. Taylor directly, another case was Capital One NA's debt buyer (Jefferson Capital System LLC) , suing Mr. Taylor on another charge off Capital One NA accounts. In both cases the required "validation notice" were never sent to Mr. Taylor

56

within 5 days of the first collection activity. Both claims were none compliant with federal and state law.

232. Exhibit A was not in compliance with the GLBA Financial Privacy Rule. Capital One NA has failed to obtain required consumer consent before they shared consumers NPI with their third party affiliates and foreign agents.

233. Exhibit A highlights Capital One NA user sharing agreement. Said agreement has been Capital One NA stated policy since on or before 2021. Capital One NA states that they share consumers information with affiliates and other business partners. Said agreement does not align with the wording or intent of the GLBA Financial Privacy Rule. Capital One NA has been sharing consumers None Public Personal information (or NPI) with unauthorized third party affiliates and foreign agents without notifying consumers and or properly complying with federal law.

234. Capital One NA shared millions of their consumers information with foreign agents and Third party affiliates during the outlined time period without obtaining proper consent as required by the GLBA.

235. Many of Capital One NA's third party affiliates and foreign agents, whom reside outside of United States Jurisdiction were not authorized to possess consumers NPI without their knowledge or consent according to the GLBA.

236. On or after 02/01/2023 Capital One NA shared the Relator Mr. Taylor NPI with debt buyers Jefferson Capital System LLC. Capital One NA shared said information without attempting to comply with the standards outlined in the GLBA.

237.     Capital One NA Breach their contract with Mr. Taylor by not fully complying with federal law; Capital One NA Breach their contract with other debtors by not following the standards outlined in the GLBA

**Capital One NA FDCPA violations:**

238.     As established in earlier sections of the complaint. From on or before 01-02-2020 until 05-31-2025 Capital One NA has used the original Creditor exemption loophole to willfully ignore consumer protection standards established in the FDCPA with impunity.

239.     Capital One NA mainly uses third party affiliates and foreign agents in their collection efforts. But they consistently attempt to use the original Creditor exemption's in local Jurisdiction without much push back.

240.     Capital One NA has been consistently overlooking FDCPA a(6); they have not been sending consumer Acknowledgement letters or validating consumer debts 5 days after initial contact.

241.     Capital One NA has used said loophole an disclosure omissions to create a clear competitive advantage over other similar Creditor in the business of collecting debt who followed the rules accordingly

242.      Capital One NA initiated collection activity on the Relator's debt but did not send a validation notice

243.     Capital One NA knowingly did not comply with FDCPA and did not send charge off accounts holders their required validation notice within 5 days after the first collection activity ( see 15 U.S.C. 1692g).

244.    Capital One NA created a competitive advantage over other similar Creditor in business of collecting debt by not complying with the rules outlined in the FDCPA.

245.    Capital One NA normally justified their none compliance with the FDCPA through the original Creditor exemption outlined in FDCPA 1692b(2). Through discovery it was uncovered that Capital One NA did not believe they were a "collector" as defined by FDCPA 1692a, because they issued the debt and assumed rules outlined in FDCPA and FCCPA did not apply to them while executing collection activity in the state of Florida and or beyond.

246.    Capital One NA mainly used third party affiliates and foreign agents in their collection efforts, thus the exemption outlined in FDCPA 1692b(2) would not apply (see FDCPA 1692a(6).

247.    Capital One NA, just as all other financial services firms were required by FDCPA 1692g to send a "validation notice" to all accounts entering collection after 5 days of the initial collection activity (if they used third party debt collector in their collection efforts).

248.    Capital One NA knowingly omitted the required "validation notice" in a high percentage (if not all) small claims charge off account holder cases reviewed during the outlined period (see FDCPA 1692e).

249.    Charge off accounts represent a significant portion of Capital One NA business model. Which were reasons which highlighted why Capital One NA, sought to increase productivity and profitability within said sector.

250.    Increasing profitability from said sector could be achieved in a number of ways, but the easiest way to increase profitability in said sector would have been to reduce

charge off accounts holders ability to challenge their debts and add "junk fees" without properly notifying consumers.

251.    Said action would yield the greatest profit and face the least risk. Thus Capital One NA and there team's advance thinker's (and or AI) crafted a strategy to Mislead the lesser Sophisticated Consumer through disclosure omission; actions which violated both FDCPA 1692e and 1692f.

252.    Since the FDCPA mainly focused on third party debt collector actions; and HAS AN UNCONSTITUTIONAL 1 YEAR STATUTE OF LIMITATIONS; most claims would not be challenged and or considered in local county courts; said misconduct became clearly mathematically more attractive to Capital One NA, then following the rules as required.

253.    Capital One NA executed an internal policy's of omitting critical disclosure for other unrelated material during the collection process of charge off accounts.

254.    Capital One NA knowingly crafted a more profitable strategy of not sending "Validation notice" (as required by FDCPA 1692g) after their initial collection contact, because most lesser sophisticated debtor's would have never notice said omitted material; and most small claims courts would not notice said omitted material either; and finally if any account holders uncovered said misconduct they could only sue for individual relief. Thus meaning Capital One NA could lose no more than a few million yearly in civil penalties, vs reported net income from charge off accounts of $1.4 billion in 2019 with increases each year that followed; thus Capital One NA knowingly choose the more profitable path and Mislead lesser sophisticated consumers and filed none compliant claims with the government.

255.    Capital One NA knowingly choose to not consider themselves as "collectors" during their collection attempts of charge off accounts holders, and then after their initial collection attempt, they willingly choose to omit critical material (see FDCPA 1692e);

256.    Capital One NA foreign agents used false (alias ) US sounding names like John, Ryan, Jill, and Sally; Most had heavy foreign accents, Most called the Relator from US based phone numbers when they were calling from outside the United States; thus Capital One NA foreign agents violated the FDCPA and sister state level consumer protection laws because they were using deceptive collection methods.

257.    Capital One NA Intentionally included unrelated material as Exhibits in most charge off account holder cases to give the "perception of Compliance", a very advance tactic designed to seemingly confuse and or mislead both the courts and lesser Sophisticated debtors during the collection process and lower court proceedings.

258.    Said unrelated material, could easily be perceived by many lesser Sophisticated readers as a "validation notice" disclosure.

259.    Said highly advance tactic was what illustrated to Mr. Taylor that Capital One NA's conduct was intentionally designed by either highly advance thinker's or AI (it would have been mathematically impossible for said unnecessary material to consistently appear in Capital One NA charge off account holder cases, in any other way).

260.    Most lesser Sophisticated reader would have never reviewed all disclosure outlined as Exhibits in their small claims case(s); which was a fact most advance thinkers clearly already knew.

261.    Capital One NA has intentionally includes unrelated disclosure in the same manner as required disclosure in a consistent pattern, while simultaneously omitting required disclosures in a similar consistent pattern.

262.    Capital One NA's policy was to knowingly executed said advance tactics and intentionally omit critical material for other unrelated unnecessary material to confuse and or mislead both lesser Sophisticated debtor and small claims court officials.

263.    The validation notice was not only a mandated federal and state prerequisite outlined in the FDCPA before initiating collection activity; said process was equally a government mandated process; which if ignored, would mean that Capital One NA knowingly denied numerous charge off account holders their Due Process Rights with impunity, in a federal and state mandated process;

264.    Thus Capital One NA violated multiple accounts holders 14th amendment rights by willfully ignoring a required federal and state process. They were Negligence Pre Se and breach their duty of care to all their affected consumers.

265.    Under Florida State (and other state laws) and federal law; no collection activity can commence in the state of Florida without a "validation notice" being sent to the account holders within 5 days after their first official contact.

266.    Capital One NA did not send the Relator Mr. Taylor his validation notice as required. Thus meaning Capital One NA clearly ran a foul of federal and state laws during their collection attempt of Mr. Taylor (and millions of other charge off account holders); see FDCPA 1692a and 1692g.

267.    Capital One NA's overall conduct in this situation also violated FDCPA 1692f and 1692f(1), by collecting amounts that were not authorized or permitted to be collected on;

268.    Said conduct also violated FDCPA 1692e because said action gave Capital One NA a clear Competitive advantage over similar firms who followed the rules accordingly; and equally said actions were prohibited under the FDCPA, no Collection activity could commence without first sending validation notice within 5 days of initial collection contact.

269.    Collecting without following all prerequisite are per se violation of the FDCPA; Capital One NA has consistently violated the FDCPA.

**Capital One NA FCA violations:**

270.    The combination of millions of claims filed from 01-01-2020 until at minimum 05-31-2025 were all none compliance with both the GLBA and FDCPA meant said claims would fit into the Implied certification FCA theory. When Capital One NA filed claims with the government they automatically Implied that all material filed was in compliance with federal law; thus because Capital One NA has filed numerous claims which were in none compliance with two federal statutes. Said actions would be considered material constitute clear FCA violations

271.    Any action which knowingly contributed to claims being filed with the government which where not inline with known federal law would be FCA 3729 violations.

272. Then Capital One NA reported the profit and or loss from said event to the government, and or correlated funds from said events with government transactions.

273. Thus making the combination of knowingly executing advance tactics to intentionally evade known federal and state statute, combined with the fact that funds from said events were reported and or correlated with government transactions, which were none compliant with federal law; meant Capital One NA committed (unknown number; 10's of thousand, even possibly millions of ) FCA violations during the outlined time period.

274. Any firm who's knowingly ran afoul of the law to evade required federal and state statutes in, their quest to maximum profits; would be committing FCA violations; because they KNOWINGLY and intentionally committed actions which ran afoul of the law; and funds from said events were then correlated with government transactions.

275. When any business filed material with the federal government, they IMPLIED that they Certify all material filed was in compliance with federal law.

276. Capital One NA filed claims with the government which were clearly in none compliance with federal and state laws.

277. Capital One NA filed claims with the government which were both none compliance with the GLBA and FDCPA.

278. Thus accordingly to the Implied certification FCA theory; since Capital One NA filed claims with the government which were material to both consumers and the government determination of disbursement; all of said claims would be considered FCA violations.

279.     There's absolutely nothing wrong with Capital One NA seeking debt recovery of debt they were owed, nor was their anything wrong with debt buyers buying debts. The problem with this situation was greed;

**How Capital One NA use "DEI" initiatives to target subprime borrower's**

280.     Capital One NA have several public statements to support this theory.

*281.*     Capital One Statements from June 2020

*"The most common plaintiffs don't tend to be household names that advertise with bold TV campaigns: Most are debt buyers, companies that buy up bad debts in bulk. The exception is Capital One.*

*Aggressive debt collection is key to Capital One's profitability. Last year, the same year the company reported $5.5 billion in net income, it recovered $1.4 billion from its card accounts that had been previously charged-off, or recognized as losses. It was a haul hundreds of millions of dollars beyond any other card issuer, even much larger ones like JP Morgan Chase." (June 2020 ProPublica Article)*

*282.*     *In a 2020 statement, a Capital One spokeswoman said the bank FILES MORE SUITS THAN OTHER BANKS BECAUSE IT MAKES RISKIER LOANS. According to public filings, as of the end of this year one-third of Capital One's cardholders had a credit score under 660, generally considered the threshold that identifies those most likely to have trouble paying debts back. The bank's current card offers for such customers carry an annual interest rate of 27%. "Most regional, community and especially large banks retreated from the subprime segment to focus on more affluent customers, resulting in a growing population of people with less access to the banking*

*system," the spokeswoman said. "Capital One remains a full spectrum lender. "Debt collection for us is about helping customers resolve their delinquent debt and reducing losses, not making money," she said, and the bank always attempts to work with borrowers before suing. (June 2020 ProPublica Article.*

283.    The above statements outlined how as early as 2020 Capital One NA considered themselves both a creditor and debt collector as defined by FDCPA (15 U.S.C. 1692a).

284.    Capital One NA not only considered themselves a "debt collector", but pride themselves on being the largest subprime debt collection bank in the nation; with net income of $1.4 billion in 2019 from charge off accounts alone.

*285.*    After reviewing all material related to this situation it became clear that Capital One NA and Citibank NA both currently have DEI exposure, which must be addressed.

**FACTS RELATING SPECIFICALLY TO CITINANK NA**

286.    From on or before 01/01/2020 until 05/31/2025 Citibank NA fail to comply with both the GLBA and FDCPA. Said events has caused numerous false claims and or reports to be filed with the government and thus said conduct was in violation of the FCA.

**Citibank GLBA violations:**

287.    From on or before 01/01/2020 until 05/31/2025 Citibank NA committed millions of GLBA violation.

288.    Citibank NA website highlights their user sharing agreement (see Exhibit C). Said agreement was considered by Citibank NA as consumer notification of the sharing of NPI with business partners, third party affiliates, and or foreign agents.

289.    Exhibit C was not in compliance with the GLBA Financial Privacy Rule. Citibank NA has failed to obtain required consumer consent before they shared consumers NPI with their third party affiliates and foreign agents.

290.    Citibank NA shared millions of their consumers protected information with foreign agents and Third party affiliates during the outlined time period without obtaining proper consent as required by the GLBA.

291.    Citibank NA's third party affiliates and foreign agents, many of whom reside outside of United States Jurisdiction, were not authorized to possess consumers NPI without their knowledge or consent according to the GLBA.

292.    Citibank NA has also shared charge off account holders NPI with affiliates and or foreign agents, without first notifying said account holders of said data sharing; in violations of GLBA.

293.    Citibank NA website Exhibit C does not align with the wording or intent outlined in the GLBA.

294.    Citibank NA has not been compliant with the GLBA and has shared debtor's NPI with third party affiliates and foreign agents in an unauthorized manner.

295.    Citibank NA shared the Relator Mr. Taylor NPI with their third party affiliates without attempting to comply with the standards outlined in the GLBA.

296.    Citibank NA was Negligence Pre Se, and breach their duty of care.

297.     Citibank NA Breach their contract with Mr. Taylor by not fully complying with federal law; Citibank NA Breach their contract with other debtors by not following the standards outlined in the GLBA

**CITIBANK FDCPA VIOLATIONS:**

298.     As established in earlier sections of this complaint. From on or before 01-01-2020 until 05 -31-2025; Citibank NA has used the original Creditor exemption loophole outlined in FDCPA 1692b(2), to willfully ignore consumer protection standards established in the FDCPA with impunity.

299.     Citibank NA mainly uses third party affiliates and foreign agents in their collection efforts (see FDCPA 1692a(6) ). But they consistently attempt to use the original Creditor exemption's in local Jurisdiction's across the nation without much push back, from local courts or debtors.

300.     Citibank NA operates as a creditor who was in the business of collecting debt directly as outlined in FDCPA 1692a.

301.     Citibank NA uses both in-house and none in-house collection representative to collect on consumer debts.

302.     Citibank NA used none in-house collection representative in their attempts to collect on the Relator's Mr. Taylor's debt.

303.     Citibank NA mainly uses none in-house collection representative in the majority of their collection efforts.

304.     Any original Creditor who uses none in-house collection representative must comply with the FDCPA (see FDCPA a(6))

305.    Citibank NA has been consistently overlooking FDCPA a(6); they have not been sending consumer Acknowledgement letters or validating consumer debts 5 days after initial contact.

306.    Citibank NA did not attempt to send charge off debtor their mandated "validation notice" (as required by FDCPA 1692g and state level consumer protection statutes.

307.    Citibank NA has used said loophole an disclosure omissions to create a clear competitive advantage over other similar Creditor in the business of collecting debt who followed the rules accordingly.

308.    Citibank NA initiated collection activity on the Relator's debt but did not send a validation notice.

309.    Citibank NA has knowingly executed advance tactics and or used their knowledge of local civil proceeding, to intentionally evade known federal and state consumers protection laws, at the expense of unknowing lesser Sophisticated consumers (see FDCPA 1692f and 1692g;).

310.    Citibank NA's misconduct was intentional an executed in an advance manner against lesser Sophisticated debtors, to knowingly evade federal and state statute, in their pursuit of maximum profitability.

311.    From 01/01/2020 until on or at least 12/31/2024; Citibank NA intentionally included unrelated material as Exhibits in small claims collection attempts and or cases, to confuse local courts and lesser Sophisticated debtors.

312.    Said material could easily be perceived by most lesser Sophisticated debtor's as a "validation notice" disclosure.

313.    Said tactic was very simple but very clever and highly profitable; which was what illustrated to Mr. Taylor that said consistent pattern of misconduct was intentionally designed by highly advance thinker or AI for greater profit (it would have been mathematically impossible for said unnecessary material to consistently appear in small claims cases for any other narrative). Most lesser sophisticated readers would have never reviewed said disclosure; which most advance thinkers clearly already knew.

314.    Thus when a Collector intentionally includes unrelated disclosure in the same manner as required disclosure in a consistent pattern; then said firm's policy must have been to knowingly executed said advance tactics and intentionally omitted critical material for other unrelated unnecessary material to confuse lesser sophisticated debtor's and small claims court officials; in their pursuit of maximum profitability.

315.    Citibank NA has Intentionally not including mandated disclosure in unknown amount of claims that have been filed with or shall be reported to the government; which were actions that are considered text book false reports and or FCA 3729 violations.

316.    Citibank NA foreign agents used false (alias ) US sounding names like John, Ryan, Jill, and Sally; Most had heavy foreign accents, Most called the Relator from US based phone numbers when they were calling from outside the United States; thus Citibank NA foreign agents violated the FDCPA and sister state level consumer protection laws, because they were using deceptive collection methods

**Citibank NA FCA violations**:

317.    The combination of millions of claims filed from 01-01-2020 until at minimum 05-31-2025 which were all none compliance with both the GLBA and FDCPA meant

70

said claims would fit into the Implied certification FCA theory. When Citibank NA filed claims with the government they automatically Implied that all material filed was in compliance with federal law; thus because Citibank NA has filed numerous claims which were in none compliance with two federal statutes. Said actions would be considered material to the situation, and therefore constitute clear FCA 3729 violations.

318.    Citibank NA then correlated profit, loss, reports, funds, and or transactions from said events and or the conduct thereof with government transactions.

319.    Citibank NA and Midland Credit Management Inc. Questionable pool transaction from 01/29/2024 notarized on 02/06/2024:

**Citibank NA & Midland Credit Management Inc. FCA violations**

320.    This complaint uncovered a major error in the pool contact between Midland Credit Management Inc. and Citibank NA dated 01/29/2024, notarized 02/06/2024, related to the Relator's wife Tunya Taylor small claim case against Midland Credit Management Inc.

321.    On 02/06/2024 Citibank NA and debt buyers Midland Credit Management Inc. were involved in a questionable pool transaction.

322.    Said pool contact was found to contain several questionable irregularities which would bring the validity of the entire agreement in question.

323.    The most glaring irregularity being that said Major contact was notarized by a state official in state unrelated to the home state of both parties without the third party state properly verifying the identification of the company official's ID.

71

324.    Debt buyers Midland Credit Management Inc. was a southern California firm and Citibank NA was a South Dakota firm.

325.    Said sale was notarized on 02/06/2024 by Kentucky state notary official using RON (Remote Online Notary) service. (See Exhibit F)

326.    Exhibit F highlights the documents related to The pool contact highlighted and the interactions between said  South Dakota firm (Citibank NA) and said southern California firm (Midland Credit Management Inc.); being notarized remotely by a notary from the great state of Kentucky.

327.    Now said events which already seemed shady (shady because California had RON and South Dakota had limited RON services, during said time period, according to Google);

328.    Said situation had the Kentucky state notary, notarized said massive transactions remotely, and not verify the ID of the (Citibank NA) South Dakota company official; allegedly because of Kentucky state rule KS 423.325(1); which permitted state notary, to not verify ID of subject, if the Notary has personal knowledge and meaningful interaction with said subject..

329.    The Citibank NA Corporate official and the Kentucky state notary claimed to personally have known one another, and said corporate official stated to have had meaningful in person interaction with said Kentucky state notary official; and they "have had dealings sufficient to provide reasonable certainty...." As outlined in KR 423.325(1).

330.    The aforementioned narrative sounds interesting, but seems highly unlikely to occur in reality; First off, a corporate office from South Dakota would have a hard time claiming to personally know and or have had "meaningful dealings " with a state official,

72

in another state; secondly said narrative does not align with reality; a corporate official in a state thousands of miles away would have a hard time claiming to personally know a state worker in a meaningful way.

331.    Thus for the notary to not verify the ID of said corporate individual in another state, whom they did not personally know in a manner which could fully establish the subjects ID; in such a large transaction, between 2 major firms in different states; were actions that do not seem above board in relation to said Major event and large pool contract thereof; Said actions were actions which were clearly in contrast to known Kentucky state rule outlined in K.S 423.325(1); thus brining the validity of the entire pool interaction and all contacts therein into question.

332.    There is no possible way a high profile representative from Citibank NA who works and lives in South Dakota; personally knows an individual state employed Notary from the southern state of Kentucky; in a manner that could satisfy Kentucky RON rules outlined in K.S. 423.55(1); there no legal way this transaction and or contract thereof could be considered valid under Kentucky law; because said pool contact was not notarized in accordance to the state law where the notary notarized the transaction.

333.    The notary in this situation seemingly committed perjury by intentionally notarizing an out of state company official, whom they did not personally know enough to not verify their ID as required.

334.    If a contact was Knowingly notarized against state law would the proceeds from said transaction be an FCA violation? Yes, knowingly false notarization creates a false record that could be material to a false claim, leading to the possibility of an FCA violations.

335.    Thus said pool transaction outlined in this section was a FCA violations.

336.    The transaction notarized on 02/06/2024 between Citibank NA and Midland Credit Management Inc. was notarized in a manner inconsistent with Kentucky state law; the state said pool contact was notarized in.

337.    Said contact was notarized by a Kentucky state notary using RON; nevertheless said Kentucky state notary official did not verify the identity of the South Dakota company official, and then justified said none permitted action by claiming, that said Kentucky state notary official, has had previous "meaningful personal dealing" with said South Dakota company official; which if accurate would have been inline with the rules outlined in KS(423.55(1)); Nevertheless this was clearly not the case, the Kentucky state notary did not personally know the South Dakota company official beyond maybe other online interactions at best; Online interactions can not be considered meaningful enough to establish an individual identity without identification in any state; thus said transaction was inconsistent with Kentucky state notary laws; meaning all accounts related to said events were FCA violations;

### Facts relating specifically to Jefferson Capital System LLC

338.    This section outlined Jefferson Capital System LLC over all conduct from January 1st 2020 until May 31st 2025.

339.    Jefferson Capital Systems violated both the GLBA and FDCPA.

340.    Once Jefferson Capital Systems purchases a pool of accounts from an original creditor, they fully own the debt and must follow all rules outlined in the GLBA, FDCPA and other state level consumer protection laws.

74

341.     Jefferson Capital System's actions violated the FDCPA, GLBA, and were clear Due Process Rights violations.

342.     Jefferson Capital Systems LLC conduct has led to multiple FCA violations:

**Jefferson Capital Systems LLC GLBA  violations**

343.     From at minimum 01/01/2020 until 05/31/2025. Jefferson Capital Systems violated the GLBA Financial Privacy Rule on multiple occasions by recklessly sharing debtor's (NPI) none public personal information with foreign agents and or third party affiliates, without obtaining proper debtor consent and or allowing the debtor the ability to contest whom their personal information was being shared with others, many of which were not directly under United States jurisdiction.

344.     Jefferson Capital System LLC website (Exhibit B) highlights specifically how Jefferson Capital System LLC User Sharing Agreement was not consistent with the wording and intent outlined in said statute.

345.     Jefferson Capital Systems shared debtor's none public personal information (or NPI) with their affiliate(s) and or foreign agents in their attempts to collect consumers debts.

346.     Jefferson Capital System LLC was required to obtain consumers consent before sharing their NPI with any Authorized third party affiliate.

347.     Jefferson Capital Systems shared Mr. Taylor's personal information and millions of other charge off accounts holders personal information with their affiliates and or foreign agents, throughout the outlined time period without following the rules outlined in GLBA.

348.    Jefferson Capital Systems knowingly excluded  debtor's form their mandated option to contest another mandated federal government process.

349.    Jefferson Capital Systems LLC actions constitute additional Due Process Rights violations; because they were denying  debtors their ability to contest a government process.

350.    Jefferson Capital Systems violated multiple charge off account holders mandated Due Process Rights by not giving them the opportunity to contest the sharing of their NPI. As outlined Jefferson Capital Systems shared debtor information with both domestic affiliates and foreign agents.

351.    Most debt collecting entities use foreign agents and or affiliate to assist in there collection efforts. There was absolutely nothing illegal about working with affiliate and or foreign agents during collections of consumers debts; but as outlined in the GLBA; if Jefferson Capital Systems shared Mr. Taylor and other debtor's personal information with affiliates and or foreign agents; then said debtor(s) should have been notified of their personal information being shared with said affiliates, and or any others Third party or foreign agent.

352.    All debtors must be notified of any sharing of their personal information as outlined in the GLBA Financial Privacy Rule.

353.    Jefferson Capital Systems has consistently shared debtor personal information with affiliates and foreign agents, without informing the debtors; and or allowing the debtor their opportunity to contest said process.

354.    Jefferson Capital System LLC actions have led to the Relator's (and thousands of other debtors) NPI being impacted by an affiliates data breach (See Exhibit  E)

355.    Jefferson Capital Systems LLC equally was none compliance with the rules established in the GLBA; (see Exhibit B) Jefferson Capital System LLC User Sharing Agreement.

**Jefferson Capital Systems LLC FDCPA violations:**

356.    Jefferson Capital Systems is a debt buyer and debt collection agency as defined by FDCPA 1692a.

357.    The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

358.    The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6 (emphasis added); see Barbato v. Greystone All., LLC, Civil Action No. 3:13-2748, 2017 U.S. Dist. LEXIS 172984 (M.D. Pa. Oct. 19, 2017); Tepper v. Amos Fin., LLC, No. 15-cv-5834, 2017 U.S. Dist. LEXIS 127697 *20-22 (E.D. Pa. Aug. 9, 2017) ("the statute provides two possible paths for a plaintiff to prove that a particular defendant is a 'debt collector.' Subject to certain exceptions not relevant here, the defendant will be a debt collector if either (1) its 'principal purpose . . . is the collection

of any debts,' or (2) it 'regularly collects or attempts to collect . . . debts owed or due . . . another.'").

359.    Jefferson Capital Systems LLC has consistently ignored the FDCPA.

360.    Jefferson Capital System used said conduct to create a competitive advantage for themselves over other similar debt collecting firms who followed the rules accordingly.

361.    Jefferson Capital Systems choose to focus on profit and deliberately ignore, consumer rights,

362.    Federal law (see FDCPA 1692g), Florida state law (and other states laws); at the expense of thousands of unknowing lesser sophisticated consumers..

363.    Jefferson Capital System Intentionally mislead lesser sophisticated debtor's by including unrelated material as material  in their collection attempts and or charge off legal cases. said actions were consistently executed to seemingly confuse lower courts and or lesser sophisticated debtor's. Said material, which could easily be perceived by lesser sophisticated readers as a "validation notice" disclosure were included to yield the Perception of Compliance.

364.    Said tactic's executed by Jefferson Capital LLC were highly profitable and were what illustrated to Relator that said initial pattern uncovered during his earlier research, was intentionally designed by highly advance thinker's and or AI systems.

365.    Jefferson Capital Systems LLC"s Conduct equally violated FDCPA 1692e; because said misconduct gave Jefferson Capital System LLC a clear competitive advantage over other similar firms who followed the rules accordingly.

366.    Most lesser sophisticated consumers and or many lower courts would have never reviewed all disclosure and or material filed with their situation to the letter, during the

collection process and or small claim proceeding; which were facts that any advance thinking individual(s) would have clearly known.

367.     Thus when a Collector as outlined by FDCPA, intentionally includes unrelated disclosure in the same manner as required disclosure to seemingly mislead lesser sophisticated consumers, in a consistent pattern, in multiple unrelated cases; then said facts seems to lead to the conclusion that said Creditor's internal policy was to knowingly executed said advance tactics against unknowing lesser sophisticated consumers.

368.     Said actions were very profitable for Jefferson Capital Systems; not sending "validation notice as required by FDCPA 1692g, would dramatically increase any debt collection firms recovery rates, overall performance review and profitability.

369.     Said action held the quickest way for Jefferson Capital System LLC to increase recovery and profitability from their charge off account holders sector; and said conduct faced the least possible risk; because "most" charge off account holders default or settle before the issues outlined in this complaint could be uncovered, only a small fraction of account holders contest their claims in court.

370.     Jefferson Capital Systems LLC Affiliate FBCS has a massive data breach on or around 02/14/2024.(See Exhibit E)

371.     Jefferson Capital Systems LLC knowingly did not disclose the data breach to impacted consumers of a data breach by their third party affiliate.

372.     The Relator Mr. Taylor and countless other unknowing lesser sophisticated consumers were directly impacted from said event, nevertheless Jefferson Capital System LLC did not notify debtors as required by the FCRA and GLBA .

373.    Jefferson Capital System LLC was required to follow the GLBA and they were required to report said incident to impacted debtor's; they did not and willfully attempted neither action as required by law.

374.    On or after 03/20/2023 Jefferson Capital Systems shared Mr. Taylor's (NPI ) none public personal information with their third party affiliate named Financial Business and Consumer Solutions Inc. or FBCS.

375.    Jefferson Capital System disclosed Mr. Taylors information to FBCS without obtaining the required consent to do so.

376.    On or around 04/28/2024 FBCS disclosed said data breach to unknowing charge off account holder's; one bring the Relator Mr. Taylor.

377.    Jefferson Capital Systems did not disclose said data breach to Mr. Taylor, nor any other debtor.

378.    Jefferson Capital System LLC did not disclose that they owed the debt associated with the impacted data breach.

379.     Jefferson Capital Systems directly owned the Relator's debt associated with FBCS's data breach.

380.     Jefferson Capital Systems was directly responsible for ensuring the protection of all consumer data associated with their ownership according to the GLBA.

381.     FBCS was sued by multiple parties during the summer of 2024. Jefferson Capital Systems attempted and was very successful at distancing themselves from their affiliate FBCS's data breach and or their association with said firm. Most lesser sophisticated debtor's had no idea that either firm was connected in any way, and or that both firms shared consumer personal data with each other.

**Jefferson Capital Systems LLC FCA violations**

382.    Jefferson Capital System executed said misconduct in a manner which directly correlated with payments, rebates, and or transaction with and or from the government; and thus Jefferson Capital System's conduct violated FCA 3729 , and several other Florida state and federal statues.

383.    Jefferson Capital Systems provided material to the Government which was in none compliance with both the GLBA and FDCPA.

384.    When Jefferson Capital Systems LLC and or any other firm in America file material with the Government they certify compliance with federal law.

385.    All Jefferson Capital Systems LLC claims filed with the federal government which were none complaint with federal law would be FCA violation

**Facts relating specifically to Midland Credit Management Inc.**

386.    From on or before 01/01/2020 until 05/31/2025 Midland Credit Management Inc. has violated both the FDCPA and GLBA. Said conduct has lead to numerous FCA violations.

**Midland Credit Management Inc. FDCPA violations:**

387.    The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

81

388.    The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6 (emphasis added); see Barbato v. Greystone All., LLC, Civil Action No. 3:13-2748, 2017 U.S. Dist. LEXIS 172984 (M.D. Pa. Oct. 19, 2017); Tepper v. Amos Fin., LLC, No. 15-cv-5834, 2017 U.S. Dist. LEXIS 127697 *20-22 (E.D. Pa. Aug. 9, 2017) ("the statute provides two possible paths for a plaintiff to prove that a particular defendant is a 'debt collector.' Subject to certain exceptions not relevant here, the defendant will be a debt collector if either (1) its 'principal purpose . . . is the collection of any debts,' or (2) it 'regularly collects or attempts to collect . . . debts owed or due . . . another.'").

389.    Midland Credit Management Inc. was required by federal and state law to send all charge off account holders their mandated "validation notice" within 5 days of their initial contact (see  FDCPA 1692g.)

390.     In many cases reviewed Midland did send most customers an acknowledgement letter, that their debt had been transferred to and or purchased by Midland Credit Management Inc.

391.    Nevertheless in most cases reviewed Midland Credit Management Inc., knowingly choose not to send charge off account holders their mandated "validation notice(s)", in a consistent manner, in multiple small claim charge off cases reviewed.

392.    Midland Credit Management Inc. conduct has violated the FDCPA 1692g 1692e and 1692f;  because said conduct was executed on the least sophisticated debtor, and said

action lead to an unfair competitive advantage over other similar firms who followed the law accordingly).

393.    Midland Credit Management Inc. activity during the outlined tine period, fit into a clear pattern of intentional irregularities.

394.    Midland Credit Management Inc. knowingly omitted sending a "validation notice" in a high percentage of their charge off account holder claims reviewed.

395.    Midland Credit Management Inc. actions were clear FDCPA violations.

396.    Most Midland Credit Management Inc. reviewed charge off account holder case files were missing "validation notice";


**Midland Credit Management Inc. GLBA violations:**

397.    Midland Credit Management Inc. violated the GLBA since on or before 01/01/2020 until May 31st 2025.

398.    Exhibit D highlight Midland Credit Management Inc. website; said website highlight how Midland Credit Management Inc. data sharing policy, was none compliant with the wording or intent of the GLBA.

399.    From 01/01/2020 until 05/31/2025 Midland Credit Management Inc. share consumer protection None Public Personal information (or NPI) with unauthorized third party affiliates and foreign agents.

400.    Midland Credit Management Inc. shared consumer NPI with unauthorized third party affiliates and foreign agents without notifying debtors and or seeking required consent to share their NPI as required by the GLBA Financial Privacy Rule.

401.    Midland has filed claims with the government which were none compliant with the GLBA.

**Midland Credit Management Inc. FCA violations**

402.    From 01/01/2020 untill 05/31/2025 Midland Credit Management Inc. committed numerous FCA violations because of the above highlighted statute violation.

403.    Midland Credit Management Inc.  executed said misconduct in a manner which directly correlated with payments, rebates, and or transaction with and or from the government; and thus Midland Credit Management Inc.'s conduct violated FCA 3729 , and several other Florida state and federal statues.

404.    Midland Credit Management Inc. provided material to the Government which was in none compliance with both the GLBA and FDCPA.

405.    When Midland Credit Management Inc. and or any other firm in America file material with the Government they certify compliance with federal law.

406.    All Midland Credit Management Inc. claims  filed with the federal government which were none complaint with federal law would be FCA violation

**Facts relating specifically to Civil Rights Act violations derived from GLBA violations.**

407.    .This section shall establish how each firms GLBA violations lead to multiple civil rights violations.

408.    First we'll look at the racial make up of subprime borrowers in America (Touchy subject but needed for this situation; Relator's must expose all uncovered misconduct derived from their investigation). Then we'll look at how limiting access to the opt-out options and other elements has specifically impacted subprime borrowers which mainly comes from historically protected groups. Then will look at what groups were impacted by the conduct outlined in this situation.

409.    Racial topics in America are normally very touchy topic; All victims are victims regardless of Race and or any other attributes. The Conduct outlined in this situation impacted million of American citizens from all backgrounds. Nevertheless the investigation into this situation has yield troubling results as in related to subprime borrowers; who mainly comprised of specific racial groups which were historically considered protected under federal civil rights laws.

410.    It must also be noted that White American Subprime borrowers come from all regions of the country and equally make up a significant percentage of victims in this situation. This complaint aim to in no way minimum the millions of hard working White American brothers and sisters who equally fail victim to the outlined misconduct. This complaint aim to hold all rule breakers accountability for all victims equally. Said element of this complaint only aim to reinforce how the intentional misconduct outlined in this situation disproportionately targeted and or fail on some groups much harder than others; which were impacts which directly related to Civil Rights laws and government transactions.

411.    As stated from the opening, this is a very complex situation. The complaint origins stated with the discovery of consistent FDCPA 1692g violations by all parties

involved (as outlined in previous sections), then the Relator uncovered all firms were consistently violating the GLBA Financial Privacy Rule.. Which were all actions which justified the initial FCA rationale.

412.    But upon further research and reflection it became clear that the manner of GLBA violation and the impacted victims mainly came from groups which were historically considered protected under federal civil rights statutes. Solely in relation to debtors, the majority of the victims impacted by the conduct outlined in this situation were subprime borrowers. Subprime borrowers are mostly likely to default and the majority of debtors who face collection efforts are subprime borrowers.

413.    By the numbers, a vast majority of subprime borrowers in America come from racial minority groups. Black and Hispanic Americans make up a significant percentage of subprime borrowers in America. In fact multiple studies have shown that Black Americans account for a much larger percentage of subprime debt then their population reflect.

**414.**    Thus meaning if any firm and or their team executed actions which specifically impacted all of their subprime borrowers. Then said actions would have directly impacted racial minority groups which were historically considered protected under federal civil rights statutes.

**What are actions consider civil right violations under federal law? (Google AI)**

415.    Under federal law, a civil rights violation occurs when a person's fundamental rights, protected by the Constitution or federal statutes, are violated by someone acting

86

under the color of law (usually government officials) or by private individuals. Common examples include

416.    *Google Question : How could federal GLBA violations be correlated with civil rights violation?*
*Violations of the Gramm-Leach-Bliley Act (GLBA) and civil rights violations, while distinct, can be correlated in several ways, particularly concerning disparate impact on protected classes. (Google 2025)*
*I.  GLBA violations impacting access to financial services*
*Redlining through data practices: If financial institutions violate GLBA by improperly sharing or securing customer data, it could indirectly facilitate or enable other forms of discrimination, such as redlining. Redlining involves denying or limiting financial services, like mortgages or loans, to residents of certain neighborhoods based on their racial or ethnic composition, regardless of their creditworthiness.*
*Targeting vulnerable communities for predatory practices: Inadequate data security under GLBA could make certain demographics more susceptible to scams and predatory lending practices. For example, if a financial institution fails to protect customer information and this information is then used to target specific communities with unfair or deceptive financial products, it could disproportionately affect protected classes and raise civil rights concerns.*
*II. Disparate impact of data breaches on protected classes*
*Financial harm and reduced access to credit: If GLBA violations lead to data breaches and identity theft, the consequences can be particularly severe for individuals in already disadvantaged communities. The financial harm caused by identity theft could further hinder their ability to access credit, housing, or other essential financial services, thereby exacerbating existing inequalities and potentially violating their civil rights to equal access.*
*III. Intersection of privacy and fair lending laws*
*Privacy and Fair Lending intersect: GLBA's privacy provisions govern how financial institutions handle nonpublic personal information about consumers, including restrictions on sharing and safeguarding sensitive data. Fair lending laws, such as the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibit discrimination in credit and housing based on protected characteristics like race, religion, national origin, sex, and more.*
*Discriminatory use of data: If financial institutions were to use data (potentially obtained or maintained in violation of GLBA) in a discriminatory manner when making lending decisions or offering financial products, it could create a link between GLBA violations and civil rights violations under fair lending laws.*

417.    *Google Question: What is the racial make up of subprime borrowers in America?*

*In the US, minority borrowers, particularly Black and Hispanic individuals, are disproportionately represented in the subprime mortgage market compared to their*

*White counterparts. Studies show that Black and Hispanic borrowers are significantly more likely to receive subprime loans than White borrowers, even when controlling for factors like credit score. This disparity is evident in both home purchase and refinance loans.*

*Higher Likelihood of Subprime Loans: Black and Hispanic borrowers are more likely to be steered towards subprime loans, even when they may qualify for prime loans.*

*Disparities in Refinancing: Black and Hispanic borrowers also face higher denial rates for refinancing and are more likely to receive subprime refinancing loans.*

*Costly Loans: Subprime loans often come with higher interest rates and fees, leading to increased costs for minority borrowers over the life of the loan.*

*Racial and Ethnic Disparities: Studies indicate that Black borrowers are roughly 2-3 times more likely to receive subprime loans than White borrowers. Hispanic borrowers also experience higher rates of subprime lending compared to White borrowers.*

*Neighborhood Effects: Subprime lending is also linked to racial segregation and concentrated in predominantly minority neighborhoods, according to the National Institutes of Health (NIH).*

*Income and Race: Research indicates that higher-income minority borrowers are more likely to be targeted for subprime loans, potentially due to the perception of them as a "niche" market.*

418.    Although this complaint is not about race; It is about accountability and the millions of subprime borrowers were directly impacted by the reckless and intentional conduct outlined in This situation who mainly derive from specific groups. Said conduct outlined in this complaint was mainly executed on groups which were historically considered protected under federal civil right act.

419.    Capital One NA and Citibank NA are two of the largest subprime lenders in the country. capital One holds the position of the largest subprime credit card lender in the United States, meaning they have a higher percentage of their total credit card lending in

the subprime category (FICO scores below 660) compared to their major competitors, like JPMorgan Chase or Citigroup.

420.    In late 2024, approximately 31% of Capital One's domestic credit card portfolio was composed of loans to individuals with FICO scores below 660. A similar portion of their auto loans was also dedicated to subprime borrowers (FICO scores below 620). In mid-2025, this pattern of substantial subprime exposure persists in both their credit card and auto loan portfolios.

421.    Citigroup was ranked as the #1 U.S. Affordable Housing Lender for the 15th consecutive year in 2024. At one point, Citigroup, through its CitiFinancial unit, was ranked #15 on the Center for Public Integrity's "Subprime 25" list of companies generating subprime loans.

422.    Jefferson Capital Systems LLC and Midland buy a majority of their charge off accounts from original creditor's like Capital One NA and Citibank NA. The majority of accounts brought by debt buyers come from subprime borrowers. Thus the same targeted impacted which impacted debtors of original Creditor, would equally impact debtors of debt buyers.

**How could the GLBA violations violate consumer civil right protection under federal law? (Google 2025)**

*423.    The Gramm-Leach-Bliley Act (GLBA) is a federal law aimed at protecting consumer financial privacy. It requires financial institutions to explain their information-sharing practices and safeguard sensitive customer data. While the GLBA's primary purpose is to protect consumer privacy, potential violations of civil rights could arise if the implementation or enforcement of the GLBA disproportionately affects certain groups or if data security failures lead to discriminatory practices.*

*424.     Here are some ways the GLBA could potentially violate civil rights protections under federal law:*

*Discriminatory data sharing or targeting: If financial institutions or their third-party affiliates use the collected data in a way that targets or excludes certain groups based on race, religion, national origin, gender, or other protected characteristics, it could raise civil rights concerns, according to Pierce Atwood. While the GLBA aims to control data sharing, misuse or lack of robust oversight could lead to discriminatory practices.*

*Inadequate security leading to disparate impact: If a financial institution's data security measures are insufficient and result in data breaches that disproportionately affect individuals from certain protected groups, it could potentially violate civil rights laws, according to BigID. This could occur if, for example, a financial institution fails to protect data effectively, leading to a breach that primarily impacts a specific demographic.*

*Differential access to opt-out rights: The GLBA grants consumers the right to "opt-out" of certain data sharing practices, according to the Federal Trade Commission (FTC). If financial institutions make it more difficult for certain populations to understand or exercise their opt-out rights due to language barriers, lack of accessibility, or other factors, it could be seen as discriminatory and potentially violate civil rights protections.  (Google 2025)*

425.     Thus this complaint has established how not only did each firm violate the GLBA, their actions directly impacted groups which were historically protected under the federal civil rights act. Executive order 14173 and DOJ May 2025 initiative, enlisted the help of the public and all Realtor's to bring action against whomever was not following the president updated civil rights laws. The May 2025 DOJ memo highlighted all civil rights laws which correlated with government transactions as enforceable. The event outlined in this situation directly correlate with government transactions.

90

## CAUSE OF ACTION

**Capital One NA:**

### COUNT I – FDCPA (Capital One NA)

426.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

427.     Capital One NA uses both in-house and none in-house collection representatives during their collection efforts of consumer debt; when Capital One NA used in-house collection representatives than they were exempt from the rules outlined in the FDCPA (see FDCPA 1692b); nevertheless when Capital One NA did  not use in-house collection representatives, then they were required to comply with the rules outlined in the FDCPA (see FDCPA 1692a(6) ).

428.     Capital One NA has been in none compliance with the FDCPA during the time period outlined in this complaint.

429.      Capital One NA has not been not validating consumer debts as required by FDCPA 1692g

430.     Capital One NA has been able to add "junk fees" with consumers debts to increase profits, without attempting to validate the debt with their consumer..

431.      Capital One NA' action have been unfair to lesser sophisticated consumers and in violation of FDCPA 1692f.

432.      Capital One NA has created a competitive advantage for themselves over other similar firms who followed the rules accordingly; and thus in violation of FDCPA 1692e.

433.    Capital One NA has outsourced their collection efforts to third party affiliates and foreign affiliates without fully complying with FDCPA collection guidelines for original Creditor who use none in-house collection representative (see FDCPA 1692a(6) ).

434.    Capital One NA violated 15 U.S.C. 1692e, $$1692e(2)(a), 1692e(10) 1692f,1692f(1), 1692g, and 1692g(b).

## COUNT II - GLBA (Capital One NA)

435.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

436.    Exhibit A (Capital One NA User Sharing Agreement) was none compliant with the GLBA Financial Privacy Rule.

437.    Capital One NA has shared their consumers NPI with unauthorized third party affiliates and foreign agents without notifying consumers and or obtaining proper consent.

438.    Exhibit A contains deceptive, misleading, and confusing statements about Capital One NA ability to share consumer NPI with business partners and third party affiliates.

439.    The unsophisticated consumer would have no idea that Capital One NA needed their consent before sharing their protected NPI with unauthorized third parties.

440.    Capital One NA's actions were in direct violation of the GLBA 15 U.S.C. 6801 - 6804 Financial Privacy Rule).

## COUNT III - FCA (Capital One NA)

92

441.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

442.    Capital One NA implied compliance with all federal laws when they executed transactions with the government related to the referenced material; said certification was material to the government determination of funds and or rebates.

443.    From on or around 01/01/2020 until 05/31/2025 Capital One NA filed and or reported millions of claims to the federal government which were in none compliance with both the GLBA and FDCPA.

444.    . Capital One NA's actions falsely certified to the federal government that claims filed in relation to the topics outlined in this complaint were above board when they clearly were not.

445.    Capital One NA conduct in relation to claims filed which were none compliant with both federal statutes meant Capital One NA committed multiple FCA 31 U.S.C. 3729-3733 violations.


## COUNT IV - FCA (Capital One NA)

446.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

447.    Capital One NA DEI policies have violated Executive order 14173 and federal civil rights act of 1964..

448.    Capital One NA has been one of the top subprime lenders in the country.

449.    Capital One has publicly targeted LMI and MDI.

450.    Capital One NA has contributed billions to DEI policies, which have specifically excluded large segments of the population in the name of Diversity.

451.    Capital One NA targeted subprime borrowers through DEI initiatives and or policies.

452.    Capital One NA gained massive profits from their DEI initiatives.

453.    Capital One NA used DEI initiatives from 01/01/2020 until on or around 02/01/2025 to increase the amount of subprime loans.

454.    Capital One NA gained massive profits from their DEI initiatives while most subprime borrowers became more indebted.

455.    Capital One NA conduct has impacted racial groups from all backgrounds but severely impacted, single white men, Black Americans of all genders, and sub sets of the Hispanic population.

456.    Capital One NA has been none compliance with the GLBA Financial Privacy Rule, and FDCPA; which meant that Capital One NA was none compliant with multiple federal statute while simultaneously specifically targeting subprime borrowers more than none subprime borrowers;

457.    Capital One NA DEI lending practices cause an explosion in subprime lending amongst targeted racial groups; which resulted in an explosion of defaults.

458.    Capital One policies have impacted Jurisdiction across the nation.

459.    Capital One NA DEI lending practices were in contrast to President Trump's Executive order 14173.

**COUNT V - 14th Amendment (Capital One NA)**

94

460.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

461.    Capital One NA ignored both the GLBA requirements and the FDCPA requirements.

462.    Both statues and disclosures thereof were mandated by the Federal government.

463.    Capital One NA restricted consumers from both processes.

464.    Thus Capital One NA violated the 14th Amendment in both process by restricting consumers consent, opt-out, and consumer protection rights, in multiple federally mandated processes.

### COUNT VI FCCPA F.S. 559.55- 559.785 (Capital One NA)

465.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

466.    F.S. 559.552 Relationship of state and federal law.—Nothing in this part shall be construed to limit or restrict the continued applicability of the federal Fair Debt Collection Practices Act to consumer collection practices in this state. This part is in addition to the requirements and regulations of the federal act. In the event of any inconsistency between any provision of this part and any provision of the federal act, the provision which is more protective of the consumer or debtor shall prevail.

467.    The FCCPA is similar to the federal Fair Debt Collections Practices Act ("FDCPA"). Shaffer v. Servis One, Inc., 347 F. Supp. 3d 1039, 1044 (M.D. Fla. 2018)

468.     In the event of any inconsistency between any provision of the FCCPA and the FDCPA, the provision which is more protective of the consumer/debtor shall prevail. §559.552.

469.     However, notwithstanding Section 559.552, the FDCPA and the FCCPA are not identical and a violation of the FDCPA does not automatically constitute a violation of the FCCPA. Kelly v. Duggan, 282 So. 3d 969, 971 (Fla. 1st DCA 2019).

470.     Capital One NA  did not comply with the rules outlined in the FDCPA ; They did not validate consumer debts (see FDCPA 1692g); said events were clearly unfair to any other lesser sophisticated consumers (see FDCPA 1692f); said actions have been consistently executed by Capital One NA  throughout the outlined time period outlined in this complaint from 01/01/2020 until at least 05/31/2025, which has created a competitive advantage for Capital One NA  over other similar debt collecting firms who followed the rules accordingly (see FDCPA 1692e); thus meaning as outlined in F.S. 559.552, the FCCPA was designed to enhance the FDCPA, if the FCCPA and FDCPA were in conflict than whichever one had the greater consumer protection should take lead (see F.S. 559.552).

471.     Capital One NA was clearly in violation of the FDCPA and thus equally in violation of the Florida state FCCPA.

472.     Capital One NA has used local attorney to evade accountability as it relates to consumers protection statutes throughout the nation.

473.     Capital One NA's  conduct against lesser sophisticated unknowing consumers demand appropriate relief.

## COUNT VII - Breach of Contract F.S. 685.01 Against John TAYLOR  (Capital One NA)

474.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

475.    To succeed in a breach of contract claim, a contract breach litigant must demonstrate: 1)The existence of a valid contract, 2) A material breach of the contract by the other party; 3) Damages suffered by the non-breaching party as a result of the breach; and 4) The plaintiff's performance of their obligations under the contract or a legal excuse for any non performance; The Plaintiff have meet each requirement.

476.    Capital One NA Breached their duty of care with Mr. Taylor.

477.    They were required by law and their contacts to comply with all federal and state laws and ensure the protection of consumer data from unauthorized third parties and foreign agents.

478.    Capital One NA was Negligence Pre Se and breach their duty of care with Mr. Taylor; they were directly responsible for ensuring only authorized third party affiliate had access to consumers information.

479.    Had Capital One NA complied with federal law as other similar firms who operate in the same business; then Mr. Taylor would not have a strong breach of contact claim against Capital One NA but in this situation Capital One NA did not comply with the Rules outlined in the GLBA Financial Privacy Rule and disclosed thereof.

480.    Thus Capital One NA Breach their contract with Mr. Taylor and said event demands relief.

**CITIBANK NA:**

## COUNT VIII – FDCPA (CITIBANK NA)

481.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

482.    Citibank NA uses both in-house and none in-house collection representatives in their consumer debt collection efforts; when Citibank NA used in-house collection representatives, then they were exempt from the rules outlined in the FDCPA (see FDCPA 1692(b)); nevertheless when Citibank NA did not use in-house collection representatives then they were required to comply with the rules outlined in the FDCPA (see FDCPA 1692a(6).

483.    Citibank NA has been in none compliance with the FDCPA from at minimum 01/01/2020 until 05/31/2025.

484.    Citibank NA has not been validating consumer debts as required by FDCPA 1692g, when they used none in-house collection representatives.

485.    Citibank NA' action have been unfair to lesser sophisticated consumers and in contrast to FDCPA 1692f.

486.    Citibank NA has created a competitive advantage for themselves over other similar firms who followed the rules accordingly; this they were in violation of FDCPA 1692e.

487.    Citibank NA has outsourced their collection efforts to third party affiliates and foreign affiliates without fully complying with collection guidelines.

488.    Citibank NA violated 15 U.S.C. 1692e, $$1692e(2)(a), 1692e(10) 1692f,1692f(1), 1692g, and 1692g(b).

## COUNT IX - GLBA (CITIBANK NA)

489.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

490.    Exhibit C (Citibank NA User Sharing Agreement) was none compliant with the GLBA Financial Privacy Rule.

491.    Citibank NA has shared debtor's NPI with unauthorized third party affiliates and foreign agents, without notifying consumers and or obtaining proper consent.

492.    .Exhibit C contains deceptive, misleading, and confusing statements about Citibank NA's ability to share consumer NPI with business partners and third party affiliates.

493.    The unsophisticated consumer would have no idea that Citibank NA needed their consent before sharing their protected NPI with unauthorized third parties.

494.    Citibank NA's conduct was Pre Se violations of the GLBA.

## COUNT X - FCA (CITIBANK NA)

495.    .Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

496.    . Citibank NA implied compliance with all federal laws when they executed transactions with the federal government related to the referenced material; said certification was material to the government determination of funds and or rebates.

497.    From on or around 01/01/2020 until on or around 05/31/2025 Citibank NA filed and or reported millions of none compliant claims to the federal government, claims which were in none compliance with both the GLBA and FDCPA.

498.    Thus Citibank NA's actions contributed to multiple FCA violations.

499.    Citibank NA violated the FCA 31 U.S.C. 3729-3733.

## COUNT XI - FCA (CITIBANK NA)

500.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

501.    Citibank NA has violated Executive order 14173 and federal civil rights statutes.

502.    Citibank NA has been one of the top DEI lenders in the country.

503.    Citibank NA has used DEI initiatives and or policies to target both Subprime borrowers form selected minority groups, while they rewarded other pre-selected groups with funding through MDI's.

504.    Citibank NA has used DEI initiatives from 01/01/2020 until on or around until at least mid 2025, to increase the amount of subprime loans and MDI investment.

505.    Citibank NA and others have used DEI initiatives to exclude certain minority groups from the bulk of MDI funding.

506.    Citibank NA has gained massive profits from their DEI initiatives while subprime borrowing exploded and most subprime borrowers became more indebted.

507.   Citibank NA has been none compliance with both the GLBA Financial Privacy Rule, and FDCPA; which meant that Citibank NA was none compliant in multiple areas, while simultaneously targeting selected groups at a greater frequency than other groups; which directly impacted the  targeted subprime borrowers more than none subprime borrowers.

508.   Citibank NA gained massive profits from their DEI initiatives while most subprime borrowers became more indebted.

509.   Citibank NA has been none compliance with the GLBA Financial Privacy Rule, and FDCPA; which meant that Citibank NA was none compliant in multiple areas while directly targeting subprime borrowers more than none subprime borrowers;

510.   Citibank NA DEI lending practices cause an explosion in subprime lending, an explosion of defaults, and greater racial exclusion than publicly known;

511.   . Citibank NA DEI lending practices have hurt communities across America and are in contrast to President Trump's Executive order 14173

## COUNT XII - FCA (CITIBANK NA)

512.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

513.   The 02/06/2024 pool transaction between Citibank NA and Midland Credit Management Inc. was a FCA violations.

514.   The transaction was not notarized in a manner which was consistent Kentucky state notary laws

515.   Said pool transaction was reported to the Government

516.    Thus said transaction between Citibank NA and Midland Credit Management Inc. Executed on 02/06/2024 was a Clear FCA violation

## COUNT XIII - 14th Amendment (CITIBANK NA)

517.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

518.    Citibank NA ignored both the GLBA requirements and the FDCPA requirements.

519.    Both statutes (GLBA and FDCPA) disclosures thereof were mandated by the Federal government.

520.    Citibank NA restricted consumers from both process.

521.    Thus Citibank NA violated the 14th Amendment by restricting consumers consent, opt-out, and consumer protection rights, in multiple federally mandated processes.

## COUNT XIV- FCCPA F.S. 559.55- 559.785 (CITIBANK NA)

522.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

523.    F.S. 559.552 Relationship of state and federal law.—Nothing in this part shall be construed to limit or restrict the continued applicability of the federal Fair Debt Collection Practices Act to consumer collection practices in this state. This part is in addition to the requirements and regulations of the federal act. In the event of any inconsistency between any provision of this part and any provision of the federal act, the provision which is more protective of the consumer or debtor shall prevail.

102

524.    The FCCPA is similar to the federal Fair Debt Collections Practices Act ("FDCPA"). Shaffer v. Servis One, Inc., 347 F. Supp. 3d 1039, 1044 (M.D. Fla. 2018)

525.    In the event of any inconsistency between any provision of the FCCPA and the FDCPA, the provision which is more protective of the consumer/debtor shall prevail. §559.552.

526.    However, notwithstanding Section 559.552, the FDCPA and the FCCPA are not identical and a violation of the FDCPA does not automatically constitute a violation of the FCCPA. Kelly v. Duggan, 282 So. 3d 969, 971 (Fla. 1st DCA 2019).

527.    Citibank NA  did not comply with the rules outlined in the FDCPA ; They did not validate consumer debts (see FDCPA 1692g); said events were clearly unfair to any other lesser sophisticated consumers (see FDCPA 1692f); said actions have been consistently executed by Citibank NA  throughout the outlined time period outlined in this complaint from 01/01/2020 until at least 05/31/2025, which has created a competitive advantage for Citibank NA  over other similar debt collecting firms who followed the rules accordingly (see FDCPA 1692e); thus meaning as outlined in F.S. 559.552, the FCCPA was designed to enhance the FDCPA, if the FCCPA and FDCPA were in conflict than whichever one had the greater consumer protection should take lead (see F.S. 559.552).

528.    Citibank NA was clearly in violation of the FDCPA and thus equally in violation of the Florida state FCCPA.

529.    Citibank NA has used local attorney to evade accountability as it relates to consumers protection statutes throughout the nation.

530.    Citibank NA's  conduct against lesser sophisticated unknowing consumers demand appropriate relief.

103

## COUNT XV - Breach of Contract F.S. 685.01 against John Taylor (CITIBANK NA)

531.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

532.     To succeed in a breach of contract claim, a contract breach litigant must demonstrate: 1)The existence of a valid contract, 2) A material breach of the contract by the other party; 3) Damages suffered by the non-breaching party as a result of the breach; and 4) The plaintiff's performance of their obligations under the contract or a legal excuse for any non performance; The Plaintiff have meet each requirement.

533.     Citibank NA Breached their duty of care with their consumers. They were required by law and their contacts to comply with all federal and state laws and ensure the protection of consumer data from unauthorized third parties and foreign agents.

534.     Citibank NA was Negligence Pre Se and breach their duty of care with their consumers; they were directly responsible for ensuring only authorized third party affiliate had access to consumers information.

535.     Had Citibank NA complied with federal law as other similar firms who operate in the same business; then the Relator would not have a strong breach of contact claim against Citibank NA but in this situation Citibank NA did not comply with the Rules outlined in the GLBA Financial Privacy Rule and disclosed thereof.

536.     Thus Citibank NA Breach their contract with consumer's and said event demands relief.

104

**JEFFERSON CAPITAL SYSTEMS LLC**

## COUNT XVI – FDCPA (JEFFERSON CAPITAL SYSTEMS LLC)

537.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

538.    Jefferson Capital Systems LLC is considered a debt collector under FDCPA

539.    Jefferson Capital System LLC has ignored complying with FDCPA 1692g.

540.    Jefferson Capital Systems LLC Actions have been unfair to lesser sophisticated consumers and in violation of FDCPA 1692f.

541.    Jefferson Capital System LLC actions have created a clear competitive advantage for themselves over other similar debt collecting firms who followed the rules accordingly which were violations of FDCPA 1792e.

542.    Jefferson Capital Systems LLC violated 15 U.S.C. 1692e, $$1692e(10), 1692f, 1692f(1), 1692g and 1692g(b).

## COUNT XVII - GLBA (JEFFERSON CAPITAL SYSTEMS LLC)

543.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

544.    Exhibit B (Jefferson Capital Systems LLC  User Sharing Agreement) was none compliant with the GLBA Financial Privacy Rule.

545.    Jefferson Capital Systems LLC  has shared consumer NPI with unauthorized third party affiliates and foreign agents, without notifying consumers and or obtaining proper consent.

546.     Form 01/01/2020 until 05/31/2025 Jefferson Capital System user sharing agreement Exhibit B was none compliant with the GLBA Financial Privacy Rule.

547.     Jefferson Capital Systems LLC has shared consumers NPI with unauthorized third party affiliates and foreign agents without notifying consumers and or obtaining proper consent.

548.     Exhibit B contains deceptive, misleading, and confusing statements about Jefferson Capital Systems LLC ability to share consumer NPI with business partners, foreign agents, and or third party affiliates.

549.     The unsophisticated consumer would have no idea that Jefferson Capital System LLC needed their consent before sharing their protected NPI with unauthorized third parties

## COUNT XVIII - GLBA (JEFFERSON CAPITAL SYSTEMS LLC)

550.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

551.     On or before 02/01/2024 Jefferson Capital Systems shared the Relator NPI with unauthorized third party affiliates FBCS without following the GLBA Financial Privacy Rule.

552.     On or around 02/14/2024 Jefferson Capital Systems LLC's third party affiliates FBCS had a data breach (see Exhibit E).

553.     Jefferson Capital Systems LLC did not report said data breach to their impacted consumers as required.

554.    Jefferson Capital System LLC did not obtain proper consumer consent before sharing said consumer data as required.

555.    Jefferson Capital Systems actions related to their third parties data breach were in violation of the GLBA Safeguarding data rule.

## COUNT XIX - FCA (JEFFERSON CAPITAL SYSTEMS LLC)

556.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

557.    Jefferson Capital Systems LLC certified  compliance with all federal laws when they executed transactions with the federal government related to the referenced material; said certification was material to the government determination of funds and or rebates.

558.    From on or around 01/01/2020 until 05/31/2025 Jefferson Capital Systems LLC filed and or reported millions of claims to the federal government which were in none compliance with both the GLBA and FDCPA.

559.    Jefferson Capital Systems LLC's actions caused untold amounts of FCA violations.

560.    Jefferson Capital Systems LLC action were Pre Se FCA violated the ( FCA 31 U.S.C. 3729-3733)

## COUNT XX – FCRA (Jefferson Capital Systems LLC)

561.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

562.     Jefferson Capital Systems LLC was impacted by their third party affiliates data breach (See Exhibit E); Jefferson Capital Systems LLC failed to inform impacted consumers that their data had been compromised.

563.     Jefferson Capital Systems LLC failed to ensure that their third party affiliate properly secured consumer data.

564.     Jefferson Capital Systems LLC actions were FCRA violations

## COUNT XXI - 14th Amendment (JEFFERSON CAPITAL SYSTEMS LLC)

565.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

566.     Jefferson Capital Systems LLC ignored both the GLBA consumer discloser requirements and the FDCPA consumer disclosure requirements.

567.     Both statutes and disclosures thereof were mandated by the Federal government.

568.     Jefferson Capital Systems LLC restricted consumers from both process.

569.     Thus Jefferson Capital Systems LLC violated the 14th Amendment by restricting consumers ability to  consent to the sharing of their NPI, or opt-out  in multiple federally mandated processes.

## COUNT XXII- FCCPA F.S. 559.55- 559.785 (Jefferson Capital Systems LLC )

570.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

571.      F.S. 559.552 Relationship of state and federal law.—Nothing in this part shall be construed to limit or restrict the continued applicability of the federal Fair Debt Collection Practices Act to consumer collection practices in this state. This part is in addition to the requirements and regulations of the federal act. In the event of any inconsistency between any provision of this part and any provision of the federal act, the provision which is more protective of the consumer or debtor shall prevail.

572.      The FCCPA is similar to the federal Fair Debt Collections Practices Act ("FDCPA"). Shaffer v. Servis One, Inc., 347 F. Supp. 3d 1039, 1044 (M.D. Fla. 2018)

573.      In the event of any inconsistency between any provision of the FCCPA and the FDCPA, the provision which is more protective of the consumer/debtor shall prevail. §559.552.

574.      However, notwithstanding Section 559.552, the FDCPA and the FCCPA are not identical and a violation of the FDCPA does not automatically constitute a violation of the FCCPA. Kelly v. Duggan, 282 So. 3d 969, 971 (Fla. 1st DCA 2019).

575.      Jefferson Capital Systems LLC  did not comply with the rules outlined in the FDCPA ; They did not validate consumer debts (see FDCPA 1692g); said events were clearly unfair to any other lesser sophisticated consumers (see FDCPA 1692f); said actions have been consistently executed by Jefferson Capital LLC  throughout the outlined time period outlined in this complaint from 01/01/2020 until at least 05/31/2025, which has created a competitive advantage for Jefferson Capital Systems LLC over other similar debt collecting firms who followed the rules accordingly (see FDCPA 1692e); thus meaning as outlined in F.S. 559.552, the FCCPA was designed to enhance the

FDCPA, if the FCCPA and FDCPA were in conflict than whichever one had the greater consumer protection should take lead (see F.S. 559.552).

576.    Jefferson Capital Systems LLC  was clearly in violation of the FDCPA and thus equally in violation of the Florida state FCCPA.

577.    Jefferson Capital Systems LLC has used local attorney to evade accountability as it relates to consumers protection statutes throughout the nation.

578.    Jefferson Capital Systems LLC 's  conduct against lesser sophisticated unknowing consumers demand appropriate relief.

## COUNT XXIII - Breach of Contract G.S. 685.01 Against John Taylor (JEFFERSON CAPITAL SYSTEMS LLC)

579.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

580.    To succeed in a breach of contract claim, a contract breach litigant must demonstrate: 1)The existence of a valid contract, 2) A material breach of the contract by the other party; 3) Damages suffered by the non-breaching party as a result of the breach; and 4) The plaintiff's performance of their obligations under the contract or a legal excuse for any non performance; The Plaintiff have meet each requirement.

581.    Jefferson Capital Systems LLC Breached their duty of care with their consumers. They were required by law and their contacts to comply with all federal and state laws and ensure the protection of consumer data from unauthorized third parties and foreign agents.

110

582.    Jefferson Capital Systems LLC was Negligence Pre Se and breach their duty of care with their consumers; they were directly responsible for ensuring only authorized third party affiliate had access to consumers information.

583.    Had Jefferson Capital Systems LLC complied with federal law as other similar firms who operate in the same business; then the Relator would not have a strong breach of contact claim against Jefferson Capital Systems LLC  but in this situation Jefferson Capital Systems LLC did not comply with the Rules outlined in the GLBA Financial Privacy Rule and disclosed thereof.

**584.**    Thus Jefferson Capital Systems LLC  Breach their contract with consumer's and said event demands relief.


## MIDLAND CREDIT MANAGEMENT INC.

## <u>COUNT XXIV– FDCPA (MIDLAND CREDIT MANAGEMENT INC.)</u>

585.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

586.    Midland Credit Management Inc. is considered a debt collector under FDCPA.

587.    Midland Credit Management Inc. has ignored complying with FDCPA 1692g.

588.    Midland Credit Management Inc.'s  actions have been unfair to lesser sophisticated consumers and thus violated FDCPA 1692f

589.    Midland Credit Management Inc. actions have created a clear competitive advantage for themselves over other similar debt collecting firms who followed the rules accordingly; and thus they were in violation of FDCPA 1692e.

590.     Midland Credit Management Inc. violated 15 U.S.C. 1692e, $$1692e(10), 1692f, 1692f(1), 1692, and 1692g(b).

## COUNT XXV - GLBA (MIDLAND CREDIT MANAGEMENT INC.)

591.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

592.     . Exhibit D (Midland Credit Management Inc. User Sharing Agreement) was none compliant with the GLBA Financial Privacy Rule.

593.     Midland Credit Management Inc. has shared consumer NPI with unauthorized third party affiliates and foreign agents without notifying consumers and or obtaining proper consent.

594.     Exhibit D contains deceptive, misleading, and confusing statements about Midland Credit Management Inc.'s ability to share consumer NPI with business partners and third party affiliates.

595.     The unsophisticated consumer would have no idea that Midland Credit Management Inc. needed their consent before sharing their protected NPI with unauthorized third parties.

## COUNT XXVI - FCA (MIDLAND CREDIT MANAGEMENT INC.)

596.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

112

597.    Midland Credit Management Inc. Certified compliance with all federal laws when they executed transactions with the government related to the referenced material; said certification was material to the government determination of funds and or rebates.

598.    From on or around 01/01/2020 until 05/31/2025 Midland Credit Management Inc. filed and or reported untold amounts of claims to the federal government which were in none compliance with both the GLBA and FDCPA.

599.    . Midland Credit Management Inc.'s actions have contributed to multiple FCA 31 U.S.C. 3729-3733 violations


## COUNT XXVII - FCA (MIDLAND CREDIT MANAGEMENT INC.)

600.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

601.    The 02/06/2024 pool transaction between Midland Credit Management Inc. and Citibank NA was a FCA violations.

602.    The transaction was not notarized in a manner which was consistent Kentucky state notary laws.

603.    Said transaction was a FCA 31 U.S.C. 3729-3733 violations.


## COUNT XXVIII - 14th Amendment  (MIDLAND CREDIT MANAGEMENT INC.)

604.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

605.    Midland Credit Management Inc. ignored both the GLBA requirements and the FDCPA requirements.

606.     Both statutes and disclosures thereof were mandated by the Federal government.

607.     Midland Credit Management Inc. restricted consumers from both federal process.

608.     Thus Midland Credit Management Inc. violated the 14th Amendment by restricting consumers consent, opt-out, and consumer protection rights, in multiple federally mandated processes.

### COUNT XXIX- FCCPA F.S. 559.55- 559.785 (Midland Credit Management Inc.)

609.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

610.     F.S. 559.552 Relationship of state and federal law.—Nothing in this part shall be construed to limit or restrict the continued applicability of the federal Fair Debt Collection Practices Act to consumer collection practices in this state. This part is in addition to the requirements and regulations of the federal act. In the event of any inconsistency between any provision of this part and any provision of the federal act, the provision which is more protective of the consumer or debtor shall prevail.

611.     The FCCPA is similar to the federal Fair Debt Collections Practices Act ("FDCPA"). Shaffer v. Servis One, Inc., 347 F. Supp. 3d 1039, 1044 (M.D. Fla. 2018)

612.     In the event of any inconsistency between any provision of the FCCPA and the FDCPA, the provision which is more protective of the consumer/debtor shall prevail. §559.552.

613.     However, notwithstanding Section 559.552, the FDCPA and the FCCPA are not identical and a violation of the FDCPA does not automatically constitute a violation of the FCCPA. Kelly v. Duggan, 282 So. 3d 969, 971 (Fla. 1st DCA 2019).

114

614.     Midland Credit Management Inc. did not comply with the rules outlined in the FDCPA ; They did not validate consumer debts (see FDCPA 1692g); said events were clearly unfair to any other lesser sophisticated consumers (see FDCPA 1692f); said actions have been consistently executed by Midland Credit Management Inc. throughout the outlined time period outlined in this complaint from 01/01/2020 until at least 05/31/2025, which has created a competitive advantage for Midland Credit Management Inc. over other similar debt collecting firms who followed the rules accordingly (see FDCPA 1692e); thus meaning as outlined in F.S. 559.552, the FCCPA was designed to enhance the FDCPA, if the FCCPA and FDCPA were in conflict than whichever one had the greater consumer protection should take lead (see F.S. 559.552).

615.     Midland Credit Management Inc. was clearly in violation of the FDCPA and thus equally in violation of the Florida state FCCPA.

616.     Midland Credit Management Inc. has used local attorney to evade accountability as it relates to consumers protection statutes throughout the nation.

**617.**     Midland Credit Management Inc.'s  conduct against lesser sophisticated unknowing consumers demand appropriate relief.

## JURY DEMAND

618.     Plaintiff through the actions of the Relator hereby demands a trial by jury.

## PRAYER FOR RELIEF

619.     WHEREFORE, Plaintiff The United States of America, through the actions of the Relator hereby requests that the Court enter judgment in favor of Plaintiff and Relator

115

against Defendants Capital One NA, Citibank NA, Jefferson Capital Systems LLC, and Midland Credit Management Inc. for:

(a) actual damages;

(b) statutory damages;

(c) attorneys' fees, litigation expenses and costs of suit; and

(d) such other or further relief as the Court deems proper.

**Dated: August 11, 2025**

I certify that a copy of this filing has been served by mailed to all relevant parties in accordance with FCA service rules on August 11, 2025.

Respectfully submitted on Monday, August, 11, 2025 by,

**John Taylor Pro Se**

**Ph.: 813-770-7188**

**Email: teaspoon.og@gmail.com**

**Address: 4525 Spring Rd Valrico FL 33596**